(861 P.2d 830)

No. 66,366

EDWARD A. MCCONWELL, *Appellant/Cross-Appellee,* v. FMG OF KANSAS CITY, INC., and FMG OF OMAHA, INC., *Appellees/ Cross-Appellants,* and DAVID H. MCMULLEN, *Appellee.*

Petition for review denied 254 Kan. ____ (February 2, 1994).

Opinion filed October 22, 1993.

*Mark V. Bodine* and *Richmond M. Enochs,* of Wallace, Saunders, Austin, Brown and Enochs, Chartered, of Overland Park, for the appellant/cross-appellee.

*Randy W. James, John C. Risjord,* and *Aaron N. Woods,* of Risjord & James, of Overland Park, for the appellees/cross-appellants.

*Alan P. Blinzler,* of Overland Park, for the appellee David H. McMullen.

Before BRISCOE, C.J., RON ROGG, District Judge, assigned, and E. NEWTON VICKERS, District Judge Retired, assigned.

BRISCOE, C.J.: Plaintiff Edward A. McConwell filed this breach of contract and quantum meruit action, seeking recovery of unpaid attorney fees he claimed were owing from defendants FMG of Kansas City, Inc., FMG of Omaha, Inc., and David H. McMullen as a result of legal services he had performed for all defendants. Defendants responded by filing separate answers and counter-

claims, alleging McConwell had committed legal malpractice which caused them to be damaged in amounts in excess of $10,000. The jury returned a verdict disallowing McConwell's claim for additional fees, but allowing his retention of fees that had already been paid. The jury also returned a verdict against McConwell on defendants' legal malpractice claims and on their misappropriation and commingling of funds claims.

McConwell appeals from all adverse rulings and judgments, including the trial court's denial of his motion for summary judgment, his motion for directed verdict, and his motion for new trial. He also appeals the partial denial of his motion for judgment notwithstanding the verdict. Defendants FMG cross-appeal the court's partial granting of McConwell's motion for judgment notwithstanding the verdict on the misappropriation and commingling of funds claims and the court's denial of defendants' request to submit a punitive damage claim to the jury.

McConwell was hired by FMG in a lawsuit filed against FMG and its incorporators by Entre Computer Centers, Inc. The directors of FMG at that time were David McMullen, Gary Fox, Donald Gutekunst, and Porter Guttery. McMullen, Fox, and Guttery, along with their spouses, held 51 percent of the stock in the FMG corporations. After rejecting a contingency fee agreement, McConwell agreed to a fee of $125 per hour and a reduced hourly rate for services by others in his office. McConwell subsequently filed a separate action against Entre on behalf of his clients, and the two actions were consolidated for trial. Before the FMG/Entre trial began, a new fee agreement was approved by the FMG directors which provided that, in addition to the hourly fee, McConwell would receive a contingency fee of 40 percent of any amount recovered that exceeded the amount necessary to discharge FMG of its obligations under certain promissory notes. Whether the new fee agreement was enforceable or was the product of duress became an issue in the present case.

The FMG/Entre trial resulted in a jury verdict favorable to FMG and two of its incorporators, McMullen and Fox, on their counterclaims in the amount of $1 million actual damages for breach of contract and $4 million actual and punitive damages for fraud. The case was appealed to the United States Court of Appeals, Fourth Circuit.

While the case was pending on appeal before the Fourth Circuit, James Quarles, an attorney for Entre, offered to settle the case for $1.3 million. The offer was made in November 1986 when counsel appeared to orally argue the appeal. The settlement was not accepted. McConwell and his associate Clay Dickey testified they immediately conveyed this offer to McMullen. McMullen and Guttery stated the offer was never conveyed to them. Fox and Gutekunst testified they knew of the offer. Quarles testified that, after the initial offer, there was no contact from McConwell's office in an attempt to settle the case. Quarles also testified that he did not inform McConwell that the $1.3 million offer was a final offer. He further testified that, had McConwell counteroffered, Quarles would have reported the offer to Entre.

Wesley Howell, another Entre attorney, testified that he made what was referred to as a "global" offer to McConwell on behalf of Entre in December 1986. By this global offer, Entre offered $2.4 to $2.7 million to settle not only the FMG litigation but also two cases McConwell had filed against Entre on behalf of other clients. As an additional part of the settlement proposal, McConwell was to agree he would not sue Entre on behalf of other claimants or, in the alternative, he was to agree to be retained by Entre for a year or two. If the offer was accepted, McConwell and his clients were to be responsible for determining how the settlement amount would be divided. This offer was also rejected. McConwell testified the offer was immediately rejected because of what he believed were unethical conditions imposed by the offer. Defendants assert this was a bona fide offer to settle the FMG litigation for a sum certain. McConwell states these discussions were no more than general conversations regarding settlement, which referenced conditions that were totally unacceptable. Howell testified that he did not recall any demands or counteroffers on behalf of the FMG litigants, except maybe a comment by McConwell that the case could be settled for an amount between $3-4 million.

In May 1987, Howell received authority from Entre to make a unilateral (non-global) settlement offer to the FMG litigants. On June 4, 1987, at 10:30 a.m., Howell contacted McConwell and offered $2.4 million to settle the FMG litigation. McConwell testified that Howell stated he might be able to obtain more,

perhaps up to $2.7 million. Howell denied indicating to Mc-Conwell that Entre was willing to offer significantly more, although he conceded there may have been an indication that a small amount in excess of the $2.4 million was available. Howell testified that McConwell stated something like, " 'Oh, that won't do it but I will talk to my folks and get back to you.' " McConwell attempted to contact McMullen to convey this offer, but was unable to speak with him because he was in Texas.

At 1:00 p.m. on June 4, 1987, McConwell returned from lunch and received notification from the Fourth Circuit that the court had reversed the $4 million fraud judgment, leaving the approximately $1 million breach of contract judgment intact (*Entre Computer Centers v. FMG of Kansas City, Inc.*, 819 F.2d 1279 [4th Cir. 1987]).

In the present action, McConwell sued FMG and McMullen for attorney fees, and they responded with legal malpractice claims. The trial court refused to submit defendants' claims for punitive damages against McConwell to the jury. The jury returned a verdict against McConwell on his claim for unpaid attorney fees but allowed him to keep those fees already received, awarded FMG $511,000 and McMullen $30,000 on their malpractice claims against McConwell for failure to settle the FMG/Entre litigation, and awarded FMG $10,070 on its claim against McConwell for misappropriation and commingling of FMG funds.

While many allegations were contained in the malpractice claims, the bulk of the damages alleged were based upon a lost settlement opportunity theory. As regards the verdicts in favor of FMG and McMullen on the malpractice claims, FMG's damages of $511,000 were found by the jury to be "the difference between the amount recovered from Entre and the amount McConwell could have obtained in settlement of the case." McMullen's damages of $30,000 were found by the jury to have resulted from "the failure to settle the Entre litigation prior to reversal." The court granted McConwell's motion for judgment notwithstanding the verdict on the counterclaim issue of misappropriation and commingling of client funds on the basis that FMG had not made a submissible case.

I. Did the trial court err in denying McConwell's motions regarding defendants' legal malpractice claim for failure to initiate or obtain settlement?

McConwell contends defendants did not prove he was liable for legal malpractice and that the trial court erred in not granting his motions for summary judgment and judgment notwithstanding the verdict. While defendants' specific allegations of legal malpractice are set forth in the pretrial order, defendants generally alleged McConwell failed to initiate settlement negotiations, to communicate settlement offers, to obtain client authority, and to disclose conflicts of interest among his clients. According to the pretrial order, FMG claimed damages in the amount of $1,704,865 plus interest, which it contended represented the difference between the verdict as affirmed by the Fourth Circuit and Entre's June 4 offer. McMullen claimed damages in the amount of $1,776,500.

In examining whether the trial court properly denied McConwell's motions for summary judgment or judgment notwithstanding the verdict, our standards of review are as follows:

"Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. [Citations omitted.] When a summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment. [Citations omitted.]" Patterson v. Brouhard, 246 Kan. 700, 702-03, 792 P.2d 983 (1990).

"K.S.A. 60-250 allows a litigant to move for a directed verdict, and for judgment notwithstanding the verdict. In ruling on a motion for directed verdict pursuant to K.S.A. 60-250, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought and where reasonable minds could reach different conclusions based on the evidence the motion must be denied and the matter submitted to the jury. This rule must also be applied when appellate review is sought on a motion for directed verdict. The same test is applicable to a motion for judgment notwithstanding the verdict." Turner v. Halliburton Co., 240 Kan. 1, Syl. ¶ 1, 722 P.2d 1106 (1986).

To recover on a legal malpractice claim, the plaintiff/client must establish "the existence of an attorney-client relationship giving rise to a duty; that the attorney breached that duty by act or

omission; that the attorney's breach of duty proximately caused injury to the client; and that the client sustained actual damages." *Phillips v. Carson,* 240 Kan. 462, 476, 731 P.2d 820 (1987).

McConwell challenges the trial court's decision and the jury's verdict by arguing that (1) as a prevailing party in the FMG/ Entre litigation, he was under no duty to actively seek a settlement with Entre or otherwise be prepared to settle when and if Entre made an offer; and (2) if there was a duty, there were no damages that proximately resulted from the alleged breach because there was no evidence that FMG, McMullen, and Fox would have accepted any settlement offer prior to the Fourth Circuit's reversal of the $4 million fraud judgment or of the amount they would have accepted if they would have agreed to settle. There is also a question of whether Entre had the desire or the ability to offer $2.4 million prior to May 1987.

McConwell cites *In re Estate of Lohse v. Rubow,* 207 Kan. 36, 483 P.2d 1048 (1971), as support for his contention that an attorney does not owe a duty to his or her client to pursue settlement negotiations. Rubow was both the administrator and the attorney for the Lohse estate. Lohse died in an automobile collision that killed three others and seriously injured another. Two actions were filed against Lohse's estate because he had been the driver of one of the cars, and two additional actions were eventually filed. The initial claims could have been settled for amounts within Lohse's insurance policy limits. However, Rubow decided to settle only one of the actions, choosing to defend the other because he had discovered evidence of contributory negligence by the second claimant. If Lubow had settled both of the initial claims, the insurance coverage would have been nearly depleted. The contributory negligence defense was not wholly successful, and a jury verdict was returned against the estate in an amount exceeding the per person policy limits.

The Supreme Court found that the attorney, as administrator, "could not have been expected to predict with exactitude the results of a trial, nor can it be said he acted in bad faith where he honestly believed or had cause to believe that the estate would be exposed to less risk if he did not insist" on not settling the second of the two initial suits. 207 Kan. at 40.

"The administrator's actions must be gauged by the circumstances as they appeared at the time of the negotiations, not by what later developed after trial. These principles have been recognized with respect to the duty of an insurer to settle within policy limits . . . , and by analogy are applicable in scrutinizing the actions of a fiduciary in the present factual context." 207 Kan. at 40.

McConwell argues he is in the same position as Rubow and that he should not be judged by hindsight for not settling the case. While we agree that McConwell should not be judged by hindsight, he nonetheless had a duty to keep his clients informed and to consult with them regarding important strategy decisions. His alleged failures in these regards were part of the negligence alleged against him. See, *e.g.,* Model Rule of Professional Conduct 1.4 (1992 Kan. Ct. R. Annot. 251). Further, although the court held Rubow was not negligent in failing to settle, an attorney's duties vary depending on each case's unique facts. Therefore, *Rubow* cannot be interpreted to hold that an attorney never has a duty to pursue settlement.

In support of their contention that an attorney has a duty to pursue settlement or otherwise communicate with his or her client, defendants rely on *Rizzo v. Haines,* 520 Pa. 484, 555 A.2d 58 (1989). Haines represented Rizzo, who was injured when his vehicle was rear-ended by a Philadelphia police vehicle. Haines initially offered to settle for $1.2 million. The City did not accept that offer, but later counteroffered $300,000 plus a lifetime pension. Haines rejected that offer. Haines raised the settlement demand to $2 million and the City lowered its offer to $50,000. During trial, a proposed settlement amount of $550,000 was rejected by Haines before it was even officially offered. The City persevered, however, and informed Haines that it had more than $550,000 and requested Haines to name the amount he really wanted. Haines did not inquire how much more the City was willing to pay, but it was later determined the City would have offered as much as $750,000. The jury rendered a verdict against the City in the amount of $450,000.

During a subsequent suit by Rizzo against Haines for legal malpractice, there was testimony by Rizzo that he had given Haines authority to settle the suit for $700,000 to $750,000. Rizzo also testified that he did not give Haines authority to raise the

settlement amount to $2 million and was not informed of the possible $550,000 figure until after the case was finalized. On appeal, the Pennsylvania Supreme Court found sufficient evidence to support the trial court's finding that Haines breached his duty of care by failing to inform his client of the possible settlement offer and by failing to investigate how much more the City would have offered. The court also found sufficient evidence to support an award of $300,000 against Haines because that figure was the difference between the amount both Haines and the City could have settled for and the amount actually received.

The *Rizzo* decision, like the *Rubow* decision, is not entirely on all fours with the present case. We do not have an allegation in the present case that there was an acceptable settlement offer that remained unaccepted simply because of lack of investigation. Further, unlike the *Rizzo* case, there is no testimony here that defendants would have settled for a certain amount or within a fixed range and that that amount was known to defendants and communicated to McConwell prior to the June 4 reversal. Instead, defendants allege that, if McConwell had better communicated with them, he would have elicited an acceptable settlement amount or would have at least been in a position to accept the June 4 offer.

The parties have not furnished the court with any Kansas case that specifically imposes a duty upon counsel to pursue settlement or to prepare for a settlement by having a pre-approved settlement amount from the client. We are guided only by the general standard of care applicable to an attorney in representing his or her client.

"An attorney is obligated to his client to use reasonable and ordinary care and diligence in the handling of cases he undertakes, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other attorneys in his community. The duty of an attorney to exercise reasonable and ordinary care and discretion remains the same for all attorneys, but what constitutes negligence in a particular situation is judged by the professional standards of the particular area of the law in which the practitioner is involved. . . .

". . . Expert testimony is generally required and may be used to prove the standard of care by which the professional actions of the attorney are measured and whether the attorney deviated from the appropriate standard. Expert testimony is required with respect to a question an ordinary person

is not equipped by common knowledge and skill to judge." *Bowman v. Doherty,* 235 Kan. 870, 878-79, 686 P.2d 112 (1984).

Lynn R. Johnson, defendants' legal malpractice expert, testified that, in a situation like the one facing McConwell and defendants, an attorney has the duty to communicate with his or her clients after a verdict in order to explain where they stand. According to Johnson, McConwell's failure to communicate led to an unfortunate situation. Johnson clearly found McConwell's performance with regard to his communication with his clients and his pursuit of a settlement of the case to be substandard:

"Q. Mr. Johnson, we've talked about various aspects of this what I call the negotiations part of the case and your opinion with respect to that. Will you tell us whether or not with respect to the entire fact circumstances surrounding the offers made by Entre, Mr. McConwell's failure to advise the client of his evaluation of the case, his failure to get authority to settle the case and his failure to pursue settlement of the case, you have an opinion as to whether or not his actions and failure to act, violate the standard of care of a reasonable, competent and prudent attorney?

"A. Yes.

"Q. And what is that opinion?

"A. Definitely his conduct was below the standard of care.

"Q. Do you have an opinion as to whether that conduct below the standard of care of a reasonable, competent and prudent attorney caused the loss or the inability to resolve the case for an amount in the thick range of 2.4 to 2.7 million before it was reversed by the 4th Circuit in June of 1987?

"A. Yes.

"Q. What is that opinion?

"A. I think it definitely cost the FMG Corporation and McMullen and Fox the opportunity to settle the case, and in my opinion, the case could have been settled if the plaintiffs were willing to settle it for in the range of 2.5 to 2.7 million and if Mr. McConwell was willing to settle it in that range and, obviously, it could have been settled between 2 and a half and $3 million in my opinion well in advance of the June 4th deadline."

This opinion is consistent with MRPC 1.4.

Although there was testimony alleging McConwell acted unethically in representing clients whose interests conflicted, that he was negligent in commingling or otherwise improperly applying funds, and that he was negligent in failing to inform his clients regarding settlement offers, only facts supporting the last category of allegations are probative of McConwell's alleged negligence in failing to settle or preparing to settle the FMG case. In applying the standards of review applicable to motions for summary judg-

ment and motions for judgment notwithstanding the verdict, there is evidence to support allegations that McConwell did not adequately inform his clients. There was also testimony by Howell and Quarles that tended to prove that McConwell did not actively participate in settlement negotiations. As a result, this testimony, when combined with Johnson's expert opinion, provided sufficient evidence from which the jury could have found McConwell did not meet the standard of care required by an attorney in these regards.

There remains the question of whether this breach was the proximate cause of the loss to McConwell's clients and whether the amount of the loss was defined or only speculative. The applicable standards of review require us to resolve all facts and inferences reasonably to be drawn from the evidence in favor of defendants. In the voluminous record presented, there is very little evidence regarding Entre's desire or ability to settle prior to May 1987. Although Johnson testified that, in all likelihood, the $2.4 million offer was available prior to June 4 and that McConwell did not meet the standard of care, this can hardly be taken as fact or as indicative of whether Entre would or could have settled for an acceptable amount prior to June 4. Instead, the testimony of Quarles and Howell must be considered in order to determine whether there was any way Entre could or would have offered to settle the case for a reasonable amount.

McConwell argues that whether a settlement could have been consummated and the amount of such settlement are so speculative as to preclude recovery by defendants, citing several cases. Defendants argue it was established that the case could have been settled for at least $2.4 million and therefore the cases relied on by McConwell are inapplicable.

In *Whiteaker v. State*, 382 N.W.2d 112, 115-16 (Iowa 1986), although defendant's attorney testified he would have considered a particular settlement figure, there was no evidence that his client would have authorized such an offer. Absent proof that defendant would have settled for that figure, the court held plaintiff failed to show the proximate cause necessary to sustain a legal malpractice claim against plaintiff's attorney. The court stated:

"Of course the client asserting this type of malpractice claim against an attorney must prove not only a breach of that duty but also that the breach

proximately caused damages. Here, Whiteaker was obligated to establish by a preponderance of the evidence that a settlement probably would have occurred but for the negligence of the State attorney. [Citation omitted.] An element of this cause of action is proof that the client and party against whom a claim has been asserted would have reached agreement upon a settlement in an ascertainable amount.

". . . From those findings, which are fully supported by the evidence, the trial court concluded that Whiteaker had failed to prove an element of this settlement prong of his malpractice action—the likelihood that a satisfactory settlement would have been concluded and paid by UPC. Nothing in the record establishes that UPC would in fact have authorized its attorney to offer Whiteaker the somewhat indefinite $16,000.00 proposal that UPC's attorney had in mind. Indeed, nothing in the record establishes the dollar value of any settlement proposal that UPC might have made in the event Whiteaker had retained private counsel at the outset." 382 N.W.2d at 116.

In *Lange v. Marshall,* 622 S.W.2d 237, 239 (Mo. App. 1981), where there was no evidence that a husband would have otherwise agreed to a particular settlement agreement, the wife could not prevail in a suit against her divorce attorney for negligence. Similarly, where a party asserting malpractice or negligence testified that a particular settlement offer would have been rejected, that party could not prevail. *Rubenstein & Rubenstein v. Papadakos,* 31 App. Div. 2d 615, 295 N.Y.S.2d 876 (1968).

We have testimony by Howell that he did not have the ability to make a non-global offer until late May 1987. However, other offers were made that were apparently unacceptable. According to testimony and defendants' briefs, the $1.3 million was not an acceptable offer because it would not pay the outstanding obligations, which is what the directors wanted. With respect to Entre's "global" offer, defendants' own expert testified it was unacceptable because of the strings attached, but he believed McConwell still had a duty to inform his clients of the offer. In light of the foregoing, only the June 4 offer was potentially acceptable. The other offers do not alone provide us with evidence that a settlement was possible either prior to June 4 or on June 4. In the absence of any evidence that Entre had the ability to settle and would have settled for an amount acceptable to defendants, defendants have failed to establish McConwell's alleged breach of duty to communicate settlement offers and pursue settlement negotiations proximately caused defendants' alleged losses.

Given our conclusion on the proximate cause question, we need not address McConwell's additional contentions that defendants failed to prove their claims of conflict of interest or damages resulting therefrom, or that McMullen was not entitled to receive damages as a result of the alleged lost settlement opportunity.

II. Did the trial conduct of defendants' attorney prejudice McConwell's case and defense?

McConwell contends that, due to numerous improper statements by John Risjord, defendants' attorney, and the fact that Risjord had personal knowledge of the FMG/Entre litigation, McConwell's case and defense were prejudiced. McConwell moved for a mistrial several different times during the trial due to Risjord's conduct.

"Generally it is within the sound discretion of the trial court to determine from all the circumstances whether alleged misconduct of counsel may have influenced a verdict, and its conclusion in the matter will not be disturbed unless, under all the circumstances, it is plainly error. [Citations omitted.]" *In re Estate of Richard,* 4 Kan. App. 2d 26, 31, 602 P.2d 122 (1979), *rev. denied* 227 Kan. 927 (1980).

"Remarks of counsel result in reversible error when, because of them, the parties have not had a fair trial." *Henderson v. Hassur,* 225 Kan. 678, 693, 594 P.2d 650 (1979).

The following is a compilation of the points alleged by McConwell in support of his attorney misconduct argument:

1. Risjord was admonished by the court a number of times during opening statement for arguing, for testifying, and for referring to violations of disciplinary rules.
2. During opening arguments, Risjord alleged that McConwell pledged someone else's money to support his own personal loan. Upon objection, the court instructed the jury to disregard the statements.
3. McConwell challenges the propriety of Risjord's representation of defendants because Risjord had personal knowledge of matters involved in the litigation and argues that, by eliciting questions from witnesses about conversations that Risjord was involved in, Risjord's participation in the trial could have been interpreted by the jury as testimony.

4. McConwell challenges Risjord's references to the rules of professional conduct and the grievance committee of the Bar.
5. McConwell contends that, by misrepresenting the law in his closing argument, Risjord prejudiced him. Risjord stated that an instruction provided: "If you find that he was negligent then you can determine that his fee is forfeited."
6. McConwell argues that Risjord's closing argument characterizing McConwell as having been "lying, cheating and stealing" warrants a new trial.
7. McConwell contends that Risjord's closing argument regarding "send[ing] . . . a message" was inflammatory.

As regards Risjord's various comments during his opening statement, the court took prompt action to sufficiently defuse any questionable aspects of the comments. Most egregious was Risjord's comment regarding McConwell's pledge of someone's money as collateral for a personal loan. The court addressed this statement and told the jury to disregard it. "It is presumed that a jury will follow and has followed the instructions given to it." *Traylor v. Wachter*, 3 Kan. App. 2d 536, 542, 598 P.2d 1061 (1979), *reversed in part on other grounds* 227 Kan. 221, 607 P.2d 1094 (1980).

McConwell failed to establish how Risjord's personal knowledge of matters involved in the litigation prejudiced McConwell's case. Nor does Risjord's use of "we" and "us" appear to be in violation of the rules of professional conduct.

Likewise, Risjord's reference to the rules of professional conduct, while unnecessary, did not deprive McConwell of a fair trial. The grievance committee reference is more troublesome. An objection to the comment was not made immediately. McConwell's counsel's objection at the next recess and in a motion for mistrial were sufficient to preserve the issue.

In denying the motion for mistrial, the court stated it believed the grievance committee had not been mentioned. The motion was later revisited outside the jury's presence and the testimony and objection were read back. The court then acknowledged this comment deserved serious consideration and stated it would have

a ruling the following morning. This motion was apparently denied the next day.

The grievance committee comment was not prejudicial. The reference would probably have little meaning to non-lawyer jurors. Even if it were prejudicial, the court carefully considered the question and apparently concluded the potential prejudice would not deprive McConwell of a fair trial. When the trial is viewed as a whole, we conclude the trial court did not abuse its discretion in denying the motion for mistrial.

As regards Risjord's misrepresentation of the law during closing arguments, there was no timely objection. See *Sparks v. Maguire,* 161 Kan. 529, 533, 169 P.2d 826 (1946). Further, the jury was given numerous instructions regarding McConwell's fees which correctly stated the applicable law.

McConwell's counsel did not object to Risjord's characterization of McConwell as having been "lying, cheating and stealing." Defendants argue this comment was proper because it was based on the testimony of witnesses, citing *City of Ottawa v. Heathman,* 236 Kan. 417, 426, 690 P.2d 1375 (1984). In *Henderson v. Hassur,* 225 Kan. at 693, the court noted that referring to an opposing party as a criminal is improper, but held the remark did not result in an unfair trial and was not reversible error. When viewed in context, we must reach the same conclusion in the present case.

Risjord's comments during closing argument regarding "send[ing] . . . a message" to plaintiff and "the whole bar" did not deprive McConwell of a· fair trial. While McConwell relies upon several cases to support his claim of prejudice, *Masson v. Kansas City Power & Light Co.,* 7 Kan. App. 2d 344, 642 P.2d 113, *rev. denied* 231 Kan. 801 (1982), is the most relevant because of the court's failure to sustain McConwell's objection. However, as has been previously stated, the ultimate question is whether McConwell was denied a fair trial. Risjord's statement was focused upon McConwell's fees. Although McConwell was not granted additional fees, he was allowed to keep the fees already received. Given this result, it is not evident that McConwell was prejudiced by this comment.

McConwell received a fair trial despite errors and possibly prejudicial remarks. Although the cumulative errors, when

viewed in close succession, appear to be prejudicial, this was a long trial and errors were inevitable. The lack of inflammation and prejudice, however, is indicated by the jury's verdict. McConwell was allowed to keep the fees he had already received. Similarly, the jury's combined award of $541,000 to defendants on their lost settlement claims is far less than the amount that was requested.

    III. Did the trial court err in denying McConwell's motion for new trial?

McConwell contends the trial court erred in not granting his motion for new trial. McConwell argues his motion should have been granted because of (1) the abuse and misconduct of defendants' counsel; (2) numerous erroneous rulings by the court; and (3) erroneous instructions; and (4) because the malpractice verdict resulted from the jury's passion and prejudice. "Our appellate review of the order denying a new trial is limited to whether the trial court abused its discretion." *State v. Anderson*, 211 Kan. 148, 150, 505 P.2d 691 (1973).

Given our review of the conduct of defendants' counsel and our conclusions in the prior issue regarding that conduct, we cannot conclude the court abused its discretion in denying a motion for new trial for alleged counsel misconduct. The erroneous rulings cited by McConwell refer to the trial court's denial of a number of McConwell's motions for mistrial, which were made and reasserted at different points during the trial because of the alleged misconduct of defendants' counsel. As we have concluded the court did not err in denying the motions for mistrial based upon counsel misconduct, we likewise conclude the court did not abuse its discretion in denying a motion for new trial based upon the same grounds.

McConwell contends three of the instructions given to the jury were erroneous and merited the court's granting of a new trial. He further contends the court erred in failing to instruct the jury on the effect of a violation of the rules of professional conduct.

McConwell argues instructions 32 and 33 are contradictory. These instructions concern the claim against McConwell for legal malpractice. As we have reversed the malpractice verdicts, any

claimed prejudice to McConwell resulting from these instructions presents a moot question.

McConwell also argues the jury instruction regarding duress was erroneous. This instruction was relevant to defendants' claim that McConwell was not entitled to all of his claimed fees because a large portion of the unpaid fees resulted from a fee contract that defendants allege was the product of duress. The instruction read as follows:

"A contract may be set aside by any person who became a party to the transaction under duress. Duress is any wrongful threat, by words or other conduct, which was intended or should reasonably have been expected to cause such fear as to deny the threatened party the exercise of free will and judgment in its decision to enter into a transaction. The test is whether or not the threat put *a person or persons representing* FMG in such fear that they could not exercise free will and judgment." (Emphasis added.)

Except for the italicized portion, this instruction contains the same language as that contained in PIK Civ. 2d 18.02D. Both at trial and on appeal, McConwell argued the italicized portion of the instruction was misleading in that it indicated that duress of one corporate representative equated to duress of the corporation, although agreement by more than one representative may be required for the corporation to take action. The trial court replied that duress of one representative could affect all of the representatives and suggested counsel's differing interpretations could be addressed in argument to the jury.

McConwell's argument concerning the duress instruction has some merit. If agreement by more than one representative is necessary for corporate action, one representative's duress would not necessarily result in the duress of the corporation. Further, although the representative under duress could influence the other representatives, the reverse is also true. Therefore, the instruction was unclear. We question, however, whether the court's denial of a motion for new trial on the basis of this instruction was an abuse of discretion.

It is not clear from the record how many FMG directors were necessary to approve the new fee agreement, or if certain representatives or officers were individually authorized to bind the corporation. For purposes of this analysis, we will adopt the apparent assumption by all parties that a majority of the directors

was required to approve the fee contract. It is also unclear from the record whether Fox was a director when the agreement was entered into and, therefore, there remains a question of whether there were three or four directors when the new fee agreement was finalized.

Clearly, the basis for the duress allegation was McConwell's threatened withdrawal from the case on the eve of trial. McMullen and Guttery both testified their decision to agree to the new fee agreement was influenced by McConwell's threatened withdrawal. If the jury believed this duress theory presented by defendants, the assent of two directors was not effective. As a consequence, whether there were three or four directors at the time the agreement was finalized, there were insufficient unaffected directors to approve the new fee agreement. Under defendants' theory, then, regardless of how the jury interpreted the instruction, the new fee agreement was not effective. In light of the foregoing, the court did not abuse its discretion in denying McConwell's motion for new trial on the basis of this instruction.

McConwell also argues the court should have instructed the jury regarding the relevance of a violation of the rules of professional conduct for attorneys to a claim of legal malpractice. McConwell offered the following instruction:

"A violation of the rules of professional conduct do not give rise to a cause of action, nor should it create any presumption that a legal duty has been breached. The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences involving such a duty."

McConwell argues this instruction was necessary because FMG's attorney referred to the rules of professional conduct numerous times. Again, in light of our reversal of the malpractice verdicts, we need not address this contention or the contention that the verdicts were the product of passion and prejudice.

IV. Did the trial court err in denying McConwell's motion for a directed verdict on the fees issue?

McConwell contends the trial court erred by denying his motion for directed verdict on the issue of his attorney fees. He

also contends the verdict was contrary to the evidence and he therefore is entitled to a new trial. McConwell apparently received at least $206,280 in fees. However, at trial he was seeking an additional amount of approximately $315,131.77. The jury verdict allowed him to keep any fees already received but denied him additional fees.

After reviewing all of the evidence pertaining to McConwell's fees and the factors surrounding his representation of defendants, we find that the court properly denied the motion for a directed verdict and that the verdict is consistent with the evidence. First, there was testimony that, right before the FMG/Entre trial, McConwell threatened to cease representation of defendants if they did not agree to the contingency fee arrangement. This belated revision of the fee contract could have been, and very possibly was, interpreted by the jury as duress sufficient to allow rescission or setting aside of this portion of the fee contract.

Second, when Johnson's analysis of McConwell's performance during the time following the jury verdict in the FMG/Entre litigation and the testimony supporting that analysis is viewed in the light most favorable to defendants, the jury could have concluded McConwell partially breached the attorney-client contract by not performing sufficiently. The jury could have found that, due to this breach, although McConwell was entitled to some fees, he had not earned all of the fees claimed. As we find a basis for the jury's verdict within the evidence presented, we must reject McConwell's argument that he is entitled to a new trial on his claim for fees.

V. Did defendants have authority to defend against McConwell's claim for fees?

McConwell contends that FMG's board of directors is deadlocked with respect to the issue of his claimed attorney fees and therefore defendants cannot defend against his fee claims. Defendants respond by contending this issue cannot be raised by McConwell because of K.S.A. 17-6104, which provides: "No act of a corporation . . . shall be invalid by reason of the fact that the corporation was without capacity or power to do such act . . . , but such lack of capacity or power may be asserted" by a shareholder against the corporation, by the corporation, or

by the attorney general. We agree with defendants. K.S.A. 17-6104 applies to bar McConwell's assertions of this contention.

VI. Did the trial court err in granting McConwell's motion for judgment notwithstanding the verdict on the misappropriation and commingling claims?

On cross-appeal, FMG contends the trial court erred in granting McConwell's motion with respect to the $10,070 awarded defendants for damages suffered when McConwell allegedly misappropriated/commingled funds. A motion for judgment notwithstanding the verdict must be denied where reasonable minds could reach different conclusions from the inferences reasonably drawn from the evidence when considered from the standpoint most favorable to the party opposing the motion. See *Turner v. Halliburton Co.*, 240 Kan. 1, Syl. ¶ 1, 722 P.2d 1106 (1986).

From defendants' brief, it is unclear what specific theory results in the $10,070 amount. However, it appears that the amount was derived from the following allegations: McConwell's alleged misuse of $1,000 for his own line of credit, his alleged commingling of funds, and his alleged unauthorized withdrawal of amounts claimed as fees from the FMG trust account.

In its journal entry granting McConwell's motion for judgment notwithstanding the verdict, the court simply stated it was granting McConwell's motion for judgment notwithstanding the verdict for "the reasons and upon the authority stated in plaintiff's oral argument and memoranda." In his motion, McConwell argues the jury concluded he was entitled to fees; therefore, his withdrawal of monies was authorized and any alleged lost interest by defendants is irrelevant. Further, McConwell argues McMullen's testimony regarding the accounting of funds and resultant lost interest was successfully challenged on cross-examination.

As regards the first point, there was evidence presented that defendants disputed McConwell's fee and opposed any distribution of funds to McConwell based upon his claim for fees. Further, there was testimony to support the conclusion that McConwell withdrew more than the jury ultimately determined he was entitled to receive or, at a minimum, he had both the immediate benefit of the money when he withdrew it and a

subsequent benefit of receiving interest on the fee amount awarded.

The second point turns upon whether McMullen's testimony was credible. McMullen's testimony was not totally negated. We have carefully examined McMullen's testimony, as it offers the most support for the misappropriation/commingling claims. From this testimony, it could be concluded that $10,070 was the lost interest incurred by defendants as a result of McConwell's premature withdrawal of $209,000 from the trust account. It was McMullen's testimony on direct that defendants lost a total of $14,751.16 in interest. On cross, counsel for defendants challenged this amount in various regards. Counsel for defendants presented McMullen with the proposition that funds were not misappropriated, but that McConwell had transferred non-FMG funds into the account which, with interest, would result in an excess of $16,268 in the account. On redirect, McMullen recalculated his figures and arrived at a total lost interest amount near the $10,070 amount that was awarded.

When the evidence is considered in the light most favorable to defendants, reasonable minds could conclude there was sufficient evidence to support the jury award of $10,070 for lost interest. The trial court erred in granting McConwell's motion for judgment notwithstanding the verdict.

VII. Did the trial court err by not allowing FMG to amend its counterclaim to seek punitive damages from McConwell?

FMG contends the trial court erred by not allowing it to amend its counterclaim to include a claim for punitive damages within the legal malpractice claim. K.S.A. 1992 Supp. 60-3703 governs whether a petition should be so amended:

"No tort claim or reference to a tort claim for punitive damages shall be included in a petition or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed. The court may allow the filing of an amended pleading claiming punitive damages on a motion by the party seeking the amended pleading and on the basis of the supporting and opposing affidavits presented that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim pursuant to K.S.A. 60-209, and amendments thereto. The court shall not grant a motion allowing the filing of an amended pleading

that includes a claim for punitive damages if the motion for such an order is not filed on or before the date of the pretrial conference held in the matter."

In order to warrant an award of punitive damages, a party has the burden of proving by clear and convincing evidence during the initial phase of the trial that the party against whom the damages are sought acted with willful or wanton conduct, fraud, or malice. K.S.A. 1992 Supp. 60-3701(c).

FMG contends that, due to the substantial competent evidence of McConwell's failure to communicate with his clients and his misappropriation and commingling of client funds, it should have been permitted to seek punitive damages. We have reversed the portion of the jury's verdict that awarded damages 38 to defendants on the lost settlement opportunity claim, which encompassed the failure to communicate allegation. In the absence of a basis for awarding actual damages, a claim for punitive damages must also fail. See *Young v. Hecht,* 3 Kan. App. 2d 510, Syl. ¶ 5, 597 P.2d 682, *rev. denied* 226 Kan. 793 (1979).

FMG also raises the misappropriation/commingling claims as support for its argument that submission of a punitive damages question to the jury should have been allowed. We have concluded the trial court erred in granting McConwell's motion for judgment notwithstanding the verdict on these claims. As regards the punitive damages motions, there was sufficient evidence that McConwell withdrew monies without permission, which could entitle FMG to seek punitive damages on the misappropriation/commingling claims.

We recently stated in *Fusaro v. First Family Mtg. Corp.,* 17 Kan. App. 2d 730, 735, 843 P.2d 737 (1992):

"K.S.A. 1991 Supp. 60-3703 requires a plaintiff to show a 'probability that the plaintiff will prevail on the claim pursuant to K.S.A. 60-209.' A probability requires more than a mere possibility, but is significantly less than a certainty that there be 'clear and convincing' evidence or whatever standard if appropriate. . . .

"The level of proof required under K.S.A. 1991 Supp. 60-3703 is 'a probability that the plaintiff will prevail.' The standard which appears to be most logical is that which would be applied if a summary judgment motion or motion for directed verdict would be filed by the *defendant.* Under this process the evidence in the affidavits would be reviewed by the court, and

if it appeared that a jury might reasonably find for the *plaintiff* the amendment would be allowed."

FMG satisfied this level of proof and was entitled to seek punitive damages on its misappropriation/commingling claims.

VIII. Is K.S.A. chapter 60, article 37, constitutional?

FMG contends K.S.A. chapter 60, article 37, which pertains to punitive and exemplary damages, is unconstitutional. Specifically, FMG argues these provisions violate the 5th, 7th, and 14th Amendments to the United States Constitution, and §§ 5 and 18 of the Bill of Rights of the Kansas Constitution because the trial court is granted authority to determine both the "probability" that a punitive damages claim will succeed and, in some instances, as the trier of fact, to also determine the amount of damages to be awarded. FMG argues that, by operation of these statutes, a litigant's right to trial by jury is effectively denied. McConwell refers to the pretrial order and contends this issue is being raised for the first time on appeal. We question whether this issue could have been raised before FMG's motion to amend its counterclaim was denied and, therefore, address the issue as timely raised. See 16 Am. Jur. 2d, Constitutional Law § 188.

The trial court's summary ability to allow submission of a punitive damages claim is analogous to its ability to grant summary judgment. See *Fusaro*, 17 Kan. App. 2d at 735. In other words, if a plaintiff fails to state a claim for punitive damages or fails to prove there is a probability they exist, the court can dispose of that aspect of the case. Summary judgment and other summary dismissals are commonly accepted and their constitutionality is also accepted. See 73 Am. Jur. 2d, Summary Judgment § 2. It therefore follows that the analogous power provided in 60-3703 is also constitutional. Further, it has been stated: "It is a generally accepted rule that once the court determines that the evidence merits submitting the punitive damage issue to the jury, it is entirely within the discretion of the jury to determine whether damages should be awarded at all and to determine the amount which should be awarded." Ghiardi & Kircher, 1 Punitive Damages Law and Practice § 5.38 (1985). See 25 C.J.S., Damages § 117(2). Further, in *Fusaro*, 17 Kan. App. 2d at 736, this court

considered the constitutional effect of K.S.A. 1991 Supp. 60-3703 and stated:

"Using this procedure, we believe the rights of the parties and the intent of the legislature are preserved. The plaintiff must show there is actual evidence which will reasonably support a verdict for punitive damages before being allowed to plead them. On the other hand, the sufficiency of the evidence is not judged solely by the court except on the level of whether a jury could reasonably rule for the plaintiff."

McConwell argues the statute is not unconstitutional because one does not have a right to punitive damages. This argument is appealing in that punitive damages are not reparative. See *Folks v. Kansas Power & Light Co.,* 243 Kan. 57, 70-72, 755 P.2d 1319 (1988). In *Kansas Malpractice Victims Coalition v. Bell,* 243 Kan. 333, 346, 757 P.2d 251 (1988), *overruled in part Bair v. Peck,* 248 Kan. 824, 844, 811 P.2d 1176 (1991), it was noted that § 18 of the Kansas Constitution states that all persons shall have a remedy by due course of law, but remedy is defined as reparation for injury. By § 18's limited definition of "remedy," punitive damages are necessarily excluded from its coverage.

Further, as noted by McConwell, it has been said "[t]here is no vested right to exemplary damages until judgment is rendered for them, and the legislature may, at its will, restrict or deny the allowance of such damages." 22 Am. Jur. 2d, Damages § 737. Support for this statement is found in *Smith v. Hill,* 12 Ill. 2d 588, 147 N.E.2d 321 (1958). See *Louisville & Nashville R. R. Co. v. Street,* 164 Ala. 155, 157, 51 So. 306 (1909) ("'[punitive] damages may be even forbidden, or affirmatively withheld, by legislative enactment . . . . In short, such damages, until a vested property right attaches to them through a judgment rendered in a party's favor, are not properly within the protection of Constitutions"). Defendants respond by arguing *Smith* is distinguishable because it is concerned with different constitutional provisions.

Defendants' main argument is that the statute is analogous to the provisions challenged in *Kansas Malpractice Victims Coalition v. Bell,* 243 Kan. 333. At issue in *Bell* was the constitutionality of a House Bill that would limit recovery of reparative, non-punitive damages in medical malpractice cases. The court examined whether the provisions violated the right to trial by jury

under §§ 5 and 18 of the Bill of Rights of the Kansas Constitution. Regarding § 5, the court noted: " 'Trial by jury is guaranteed only in those cases where the right existed at common law.' " 243 Kan. at 342. The court then stated that, because damages were allowed at common law, the right to jury trial applied. This statement could be interpreted as also applying the right to a jury trial to an action for punitive damages because they too were allowed at common law. See *Folks v. Kansas Power & Light Co.,* 243 Kan. at 71.

While the *Bell* rationale may apply to limits on punitive damages, we conclude it does not apply to the statutes challenged here. See 1 Schlueter & Redden, Punitive Damages § 3.12 (2d ed. 1989). While *Albert Wiley v. Keokuk,* 6 Kan. 94 (1870), reaffirmed the right of a jury to determine the amount of punitive damages, Kansas has long accepted the concept that it is the responsibility of the court to initially determine whether there is evidence to justify submission of a punitive damages question to the jury. See *Schumock v. Meerian,* 175 Kan. 8, 10, 259 P.2d 173 (1953). Further, as noted, this appears to be the general rule followed in treatises and courts of other jurisdictions that have addressed constitutional challenges to punitive damage statutes.

All rulings and judgments appealed and cross-appealed are affirmed except for: (1) the legal malpractice verdict against McConwell, which is reversed; (2) the granting of McConwell's motion for judgment notwithstanding the verdict on the misappropriation/commingling claims, which is reversed and remanded with directions to enter judgment against McConwell in the amount of $10,070; and (3) the denial of defendants' motion to amend to allow defendants to seek punitive damages on the misappropriation/commingling claims, which is reversed and remanded for new trial.