No. 66,302

RICHARD D. WAHWASUCK, *Appellee*, v. KANSAS POWER AND LIGHT COMPANY, *Appellant.*

(828 P.2d 923)

Opinion filed April 10, 1992.

*Jeffrey S. Southard*, General Attorney, Litigation and Environment, The Kansas Power and Light Company, of Topeka, argued the cause and was on the brief for appellant.

*William J. Pauzauskie*, of Topeka, argued the cause, and *Dan L. Wulz*, of Bryan, Lykins, Hejtmanek & Wulz, P.A., of Topeka, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a personal injury action. The issues involve whether The Kansas Power and Light Company (KP&L), the defendant, is liable for the plaintiff's injuries and for the damages awarded.

The plaintiff, Raymond D. Wahwasuck, was employed as a laborer by A & G Underground (A&G). A&G, a trenching company, contracted with various public utilities to dig and lay power lines. Southwestern Bell Telephone Company employed A&G to lay underground telephone cable in a utility easement located in a residential area of Lawrence. Two of KP&L's lines were buried in the easement. One line was a 7,200-volt line and the other, a 120-volt line.

On December 3, 1987, A&G began its trenching operation. The person who operates the trenching machine is seated upon the machine. The digging tool is at one end of the machine. Wahwasuck was standing at the opposite end of the machine, approximately 10 to 15 feet away. Wahwasuck was wearing his everyday working attire, and he was not touching anything, other than the ground upon which he was standing. The trenching machine "intercepted" the 120-volt line. Those present testified concerning the ensuing noise and sparks.

Simultaneous with the severing of the power line, Wahwasuck fell to the ground. Wahwasuck described the sensation as being knocked to the ground by electric shock. He was unable to get up and rolled around on the ground, holding his knee. The testimony of his co-workers, who were present when the line was severed, confirmed his story. When the sensation ceased, his co-workers came to his assistance, and he was taken to the hospital. Wahwasuck's injury involved the patellar tendon separating from the tibia. Dr. William Bailey, who treated Wahwasuck, testified that a sudden severe trauma caused the injury. The doctor performed surgery to reattach the patellar tendon to the tibia.

The jury awarded Wahwasuck $200,000 in damages, assessing 99 percent of the fault to KP&L and 1 percent of the fault to Wahwasuck's employer.

## I. CAUSATION AND FORESEEABILITY

KP&L's argument here is two-fold: Wahwasuck failed to prove a causal connection between KP&L's failure to mark the line properly and Wahwasuck's injury, and Wahwasuck did not prove his injury was foreseeable. Based upon this premise, KP&L contends that the trial court erred in denying its motions for directed

verdict, for judgment notwithstanding the verdict, and for a new trial.

The standard for appellate review of these three motions is well established.

"In ruling on a motion for directed verdict, the trial court as well as the appellate court must resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based upon the evidence, the motion must be denied and the matter submitted to the jury. The same test is applicable to a motion for judgment notwithstanding the verdict." *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, Syl. ¶ 1, 815 P.2d 72 (1991).

"The granting of a new trial is a matter of trial court discretion and, as with all discretionary matters, will not be disturbed on appeal except by a showing of abuse of that discretion." *State v. Brown*, 249 Kan. 698, Syl. ¶ 1, 823 P.2d 190 (1991); see *Douglas v. Lombardino*, 236 Kan. 471, 487, 693 P.2d 1138 (1985). "The test on appellate review of whether the trial court abused its discretion is whether no reasonable person would agree with the trial court. If any reasonable person would agree, appellate courts will not disturb the trial court's decision." *Anderson v. Heartland Oil & Gas, Inc.*, 249 Kan. 458, Syl. ¶ 7, 819 P.2d 1192 (1991).

In its memorandum decision denying KP&L's motions for judgment notwithstanding the verdict and for a new trial, the trial court quoted with approval American Jurisprudence's discussion of negligence and its relationship to electricity.

"To recover for injuries sustained through electricity, it is not enough that the defendant is shown to have been negligent, but the fact must be established that some legal injury resulted to the plaintiff as a proximate result of the negligence. . . . [T]he proximate cause of an injury has been defined as that which, in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, without which such injury would not have occurred.

. . . .

"The negligence of an electric company . . . engaged in the transmission or use of electricity cannot, according to the generally accepted test, be said to be the proximate cause of an injury within the law of negligence unless, under all the circumstances, the injury might have been reasonably foreseen by a person of ordinary intelligence and prudence. It is not enough to prove the injury is a *natural* consequence of its negligence; it must also have been the *probable* consequence. . . . [T]here is *no duty of care* to safeguard against occurrences that cannot be reasonably expected or con-

templated. . . . If . . . the injury follows as a direct consequence of a negligent act or omission, it cannot be said that the company is not responsible therefor because the particular injury could not have been anticipated." 26 Am. Jur. 2d, Electricity, Gas, and Steam § 47-48, pp. 256-58.

"Although usually the issue of proximate cause is a question of fact for the jury [citation omitted], it becomes a question of law when all evidence relied upon by a party is undisputed and susceptible of only one inference. [Citation omitted.]" *St. Clair v. Denny*, 245 Kan. 414, 420, 781 P.2d 1043 (1989). KP&L argues it is liable only if electricity shocked Wahwasuck. KP&L then contends it was undisputed that electricity could not have flowed to where Wahwasuck was standing when the power line was severed. Therefore, according to KP&L, Wahwasuck failed to prove causation.

Is the evidence here undisputed and susceptible of only KP&L's interpretation? The trial court did not agree with KP&L, concluding:

"The trenching tool contacted the line as a direct result of the failure to properly mark the line. This is easily established by the evidence and is not disputed.

"Had electricity flowed through the metal of the machine into the workman who was operating the machine we could have had an event entirely explainable within our common or ordinary experience and understanding.

"What did happen is all the same events except the electricity took an unexplained course. A workman who was not in contact with the machine was injured. Somehow electric current flowed from the broken line to this workman to cause injury. The evidence does not give us a scientifically acceptable explanation of how the electricity took the path that it took. The evidence is overwhelming that it did happen.

"My conclusion is that it is not necessary under facts such as these for the injured worker to have a precise scientific explanation for what occurred."

The record supports the verdict. There was evidence about the unpredictable nature of electricity. Additionally, the earth can be a conductor of electricity, although the earth is not as good a conductor as metal. The ground was not tested to determine if it had metal in it. There also was a metal conduit in the vicinity of Wahwasuck. There was testimony of frost on the ground, which, as a form of moisture, could serve as a conduit. The jury could have found the line was buried some six inches below the surface. As Wahwasuck points out, KP&L did not prove it was

scientifically impossible for Wahwasuck to have received an electric shock.

Wahwasuck also asserted that his injury could have been caused by sudden movement, that is, when he attempted to run from the danger and fell. He clearly raised that issue throughout the discovery proceedings, at pretrial, and when instructions were discussed. We do not read the plaintiff's testimony as inconsistent with that position. Whether the plaintiff thought his knee was injured by electricity and not by sudden movement is immaterial under the facts of this case.

It is undisputed that Wahwasuck's injury occurred when the line was cut. He testified that, when the line was severed, he saw sparks and blue smoke. His co-workers' testimony was similar. When the line was cut, Wahwasuck turned around as if he was attempting to get away. He fell down four times and, when rolling around on the ground, held his leg. At that time, the only KP&L line in the easement of which the plaintiff was aware was the 7,200-volt line.

The trial court also determined that the foreseeable event, digging in the hole, occurred: "The line wasn't adequately marked. The trencher dug into the line and broke it as any reasonable person would have predicted. An injury occurred to a workman on the trenching crew."

KP&L asserts that the trial court misstated the law: "[[T]he thing which must be foreseeable . . . is the *injury* to plaintiff, and not the *act* of severing the line." In *Henderson v. Kansas Power & Light Co.*, 184 Kan. 691, 700, 339 P.2d 702 (1959), this court held:

"The test for negligence or the absence of negligence on the part of the defendant was not whether it should have anticipated the particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result from any reasonable thing that might be done upon [the] property by people who had a right to go there, either for work, pleasure or business. [Citations omitted.]"

Regarding foreseeability, in *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 65, 755 P.2d 1319 (1988), this court also stated that

"[i]t is the duty of electric companies to guard against contingencies which can be reasonably foreseen and anticipated, and it is not necessary that the precise injury should have been anticipated so long as the probability of

injury to someone who had a right to be in the vicinity might have been reasonably anticipated."

KP&L also argues the injury was not foreseeable because of the remoteness of Wahwasuck's location from where the line was severed. There was testimony that Wahwasuck was 10 to 15 feet behind the trencher immediately before the line was cut.

KP&L contends that to hold it liable for Wahwasuck's injuries elevates KP&L to the status of an insurer, which is contrary to Kansas law. See *Wilson v. Kansas Power & Light Co.*, 232 Kan. 506, 513, 657 P.2d 546 (1983); *Henderson*, 184 Kan. at 696. KP&L bases its argument solely on the testimony of its expert witness, the only expert witness KP&L deems qualified to have testified. KP&L's expert testified that electricity, as a matter of physical law, does not travel through ground in the absence of a conductor or circuit. KP&L claims that "if such a miraculous event did occur . . . , it could not have been foreseen by [KP&L], as it was outside the 'usual experience of mankind.' "

KP&L's argument is not persuasive. The record supports the trial court's finding that it was reasonable for KP&L to have anticipated the probability of injury to Wahwasuck, who was in the vicinity and had a right to be in the vicinity.

The jury was instructed "to determine the weight and credit to be given the testimony of each witness . . . [and] to use common knowledge and experience." Because the jury followed these instructions and did not rely totally upon KP&L's expert, it cannot be said that the jury ignored the evidence. Here, reasonable minds could reach different conclusions, based upon the evidence, about what caused Wahwasuck's injury. Furthermore, Wahwasuck's injury was foreseeable. Therefore, the trial court did not err in denying KP&L's motions.

## II. EXPERT TESTIMONY OF ROBERT ELLIOTT

Prior to trial, KP&L filed a motion in limine, objecting to Robert Elliott's qualifications to testify on several matters, including application of the National Electrical Safety Code (NESC) to KP&L's policies and procedures on marking underground lines and to KP&L's employee safety manual. During trial, the trial court allowed KP&L's counsel to voir dire Elliott about Elliott's qualifications as an expert. After voir dire, the trial court ruled

Elliott was qualified to offer expert testimony about interpreting and applying the NESC.

Elliott testified as follows: The NESC, which is applicable to KP&L, sets forth *minimum*, but mandatory, safety standards for underground excavation. Under the section "Underground Lines" and the subsection "Excavation," the NESC provides: "Cables and other buried utilities in the immediate vicinity shall be located, to the extent practical, prior to excavating." The NESC has not defined the term "immediate vicinity"; however, in Elliott's opinion, immediate vicinity "would constitute all company owned facilities which a person may reasonably have the opportunity of coming into contact with during the course of constructing a project." Elliott concluded that KP&L did not comply with the intent of the NESC in marking the line in question. He said that "marking should be done to the extent that it will give . . . the maximum possible knowledge of the existence of that underground line." Additionally, Elliott reviewed KP&L's safety manual for employees and concluded that the safety manual did not comply with the intent of the NESC.

On appeal, KP&L claims that the admission of Elliott's testimony was reversible error. As Wahwasuck points out, KP&L's argument focuses on Elliott's qualifications. KP&L does not suggest that expert testimony on these subjects was not helpful to the jury.

K.S.A. 60-456(b) governs the admission of expert testimony:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

In *Marshall v. Mayflower Transit, Inc.*, 249 Kan. 620, 822 P.2d 591 (1991), this court reviewed the admissibility standards for expert testimony:

"Expert opinion testimony is admissible if it will be of special help to the jury on technical subjects with which the jury is not familiar or if such testimony will assist the jury in arriving at a reasonable factual conclusion from the evidence." Syl. ¶ 6.

"The admissibility of expert testimony is within the broad discretion of the trial court. A party claiming an abuse of trial court discretion bears the burden of showing abuse of discretion. The test on appellate review of

whether the trial court abused its discretion is whether no reasonable person would agree with the trial court. If any reasonable person would agree, appellate courts will not disturb the trial court's decision." Syl. ¶ 8.

Relying upon *Avey v. St. Francis Hospital & School of Nursing*, 201 Kan. 687, 442 P.2d 1013 (1968), and *State v. Duncan*, 221 Kan. 714, 562 P.2d 84 (1977), KP&L asserts that Elliott's testimony should have been excluded because Elliott did not have sufficient knowledge of the subject matter to qualify as an expert. In *Avey*, this court stated that "the test of competency of an expert witness is whether he discloses sufficient knowledge to entitle his opinion to go to the jury." 201 Kan. 687, Syl. ¶ 2. In *Duncan*, this court stated that "[w]hen the testimony sought requires proper foundation and knowledge to express an opinion and it is not shown the witness has such knowledge, the opinion testimony is so conjectural as to lack probative value and may be properly excluded by a trial court." 221 Kan. 714, Syl. ¶ 6.

To further its assertion, KP&L advances a number of reasons why Elliott was not qualified to testify, including that Elliott has no employment background with electric utilities; that he has no background in working with either overhead or underground electrical lines; and that he has had no education or training in the fields of electric current, current theory, or electrical engineering.

Elliott acknowledged that he has never been employed by an electric utility. Although he has little formal training in the area of electrical engineering, having attended only one seminar on the subject, Elliott testified that he has gained knowledge of electrical currents, current theory, and electrical engineering by supervising electrical engineers for the past eight years. He has had eight years of "real life experiences" involving electricity and rural electrical engineering. For example, Elliott supervised engineers who were remodeling a 30-story building. That project included evaluating the building's electrical wiring.

Elliott's prior job was manager of engineering design for Michigan Consolidated Gas Service, a utility company that distributes natural gas. At the time of the trial, Elliott had been chief engineer for the Kansas Corporation Commission (KCC) for five years. He handles the public's requests for interpretations of the NESC. He regularly interacts with electric utility engineers from all of the Kansas utility companies, including KP&L and rural

electric cooperatives. The KCC approves all aspects of KP&L's electrical work in terms of building electric lines. Elliott also receives reports of any fatalities or serious injuries caused by electric utilities in Kansas. He did not investigate Wahwasuck's injury because it was never reported to the KCC.

Elliott received a Masters Degree in environmental engineering from Drexel University in Philadelphia. Elliott subscribes to several electricity-related magazines: *Electrical World,* a commonly read magazine in the electrical industry; *Power Magazine,* which focuses on electrical power issues; and *Independent Energy,* which focuses on independent companies' generation of electricity.

A sampling of KP&L's other complaints concerning Elliott's qualifications include that Elliott is not a member of a professional electricity or electric transmission society; that prior to this case, he had not testified as an expert witness in a case involving underground electric lines; and that he has not participated in any studies concerning the safety of underground electric lines. KP&L contends that Elliott's "only seeming qualification" for offering expert testimony is the fact that he works for the state regulatory agency, the KCC. Furthermore, according to KP&L, Elliott's

"knowledge is little more than that of a layman, and is inadequate to allow him to express his opinion on matters which are technical enough to require the knowledge, skill and training of electrical engineers who have experience in dealing with electricity in general and underground lines in particular."

Mere allegations and speculations by KP&L are not proof that Elliott was not qualified to testify as an expert. A reasonable person could concur with the trial court's finding that Elliott had the requisite expertise to testify, based upon Elliott's education, training, experience, and current responsibilities. The trial court did not abuse its discretion in allowing Elliott to testify to the extent he testified in this case.

### III. FUTURE LOSS

Over KP&L's objection, the trial court instructed the jury that if it found for Wahwasuck, it could consider "[l]oss of time or income to date by reason of [Wahwasuck's] disability and that which he is reasonably certain to lose in the future."

In *Morris v. Francisco*, 238 Kan. 71, Syl. ¶¶ 2, 3, 708 P.2d 498 (1985), this court held:

"In an action for personal injuries, the trial court should instruct the jury only on those items of damage upon which there is some evidence to base an award. It is not proper to give a general instruction on damages for 'any of the following shown by the evidence' when there is no evidence to support an award for a particular item."

"In a negligence action, recovery may be had only where there is evidence showing with reasonable certainty the damage was sustained as a result of the complained-of negligence. Recovery may not be had where the alleged damages are too conjectural or speculative to form a basis for measurement. To warrant recovery of damages, therefore, there must be some reasonable basis for computation which will enable the trier of fact to arrive at an approximate estimate of the amount of loss."

The *Morris* case upheld the submission of a similar instruction, even though the evidence was "scanty." 238 Kan. at 82.

Here, the trial court concluded there was a basis for the instruction because of evidence that Wahwasuck would benefit from physical therapy and that a rehabilitation program would entail Wahwasuck's absence from work without pay. KP&L continues to maintain that the evidence was too speculative for the trial court to have submitted Wahwasuck's claim for past and future income loss to the jury.

Wahwasuck was off work for six months after the accident. He presented evidence that he has a permanent, progressive injury. Dr. William Bailey, who originally treated Wahwasuck for the injury, testified there was a 50 percent chance that Wahwasuck would need another operation. The next operation could be smoothing off the surface of the kneecap, which in today's dollars would cost about $2,500 with a day or two in the hospital. Wahwasuck could also require surgery to replace his knee joint. In today's dollars, that operation would cost about $10,000 with 10 days in the hospital. Dr. Bailey also testified that Wahwasuck would benefit from a physical therapy program that could last from two to six months. Dr. Michael McCoy also concluded that Wahwasuck would benefit from a physical therapy program and estimated such a program could last from two to five months.

Donald Picotte, Wahwasuck's employer, testified that the company would work with Wahwasuck as much as possible, but company policy necessitated that if Wahwasuck took time off work,

he would be on medical leave. In other words, if Wahwasuck missed work to attend therapy, he would not be paid for the time absent from work.

At the time of trial, Wahwasuck received $140 a month in compensation from the National Guard. Since the accident, Wahwasuck has managed to pass the physical tests except the requirement of running 2 miles in 17 minutes. He must pass this test in order to remain in the National Guard. Wahwasuck believed he still had a couple of chances to pass the test. Nonetheless, he was doubtful of his ability to pass the test because of the problems with his knee and felt his future with the National Guard was jeopardized. Thus, Wahwasuck could lose his National Guard income. Additionally, if he is unable to remain in the National Guard, he will lose his retirement benefits. He must complete 20 years with the National Guard to receive retirement benefits. As of 1992, he will have completed 12 years with the National Guard.

The trial court did not err in submitting Wahwasuck's claim for past and future income loss to the jury.

KP&L also comments that the verdict form was not itemized, pursuant to K.S.A. 1991 Supp. 60-249a. The trial court, however, used the verdict form proposed by KP&L. Additionally, KP&L failed to object to the verdict form.

## IV  DAMAGES

KP&L asserts that this court should order a new trial or, in the alternative, reduce the amount of damages in the form of a remittitur because the trial court abused its discretion. "The granting of a new trial is a matter of trial court discretion and, as with all discretionary matters, will not be disturbed on appeal except by a showing of abuse of that discretion." *State v. Brown*, 249 Kan. 698, Syl. ¶ 1, 823 P.2d 190 (1991). KP&L maintains that the trial court abused its discretion because the evidence does not support the verdict—the damages awarded.

"When a verdict is attacked on the ground that it is contrary to the evidence, it is not the function of this court on appeal to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the successful party, will support the verdict, this court should not intervene." *Johnson v. Geer Real Estate Co.*, 239 Kan. 324, 325, 720

P.2d 660 (1986); see *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, Syl. ¶ 2, 815 P.2d 72 (1991).

KP&L claims that any damages awarded for lost income or future medical costs were "entirely speculative." "In reviewing an award for an objective element of damages such as loss of past and future income, an appellate court must look to the record to see if there is evidence to support the jury's calculation of pecuniary loss." *Morris*, 238 Kan. at 79. In discussing how damages for loss of past and future income should be calculated, this court has observed that

"the extent of the diminution or impairment of earning capacity is a relevant consideration and is arrived at by comparing what the injured party was capable of earning at or before the time of the injury with what the party is capable of earning after the injury. This is recovery for injury to the capacity to earn and is relevant in calculating a party's loss of earnings.

"In addition, in determining the amount to be awarded for decreased earning capacity, the jury should consider the health of the injured party and the party's physical ability to maintain herself before the injury, as compared with her condition in these respects afterward. [Citation omitted.]" 238 Kan. at 79.

Because the judgment was not itemized, an exact comparison of the jury's calculations for past and future lost income and medical costs with the evidence is not possible. In viewing the evidence in a light most favorable to Wahwasuck, who prevailed below, the following can be noted.

Wahwasuck was 30 years old at the time of the trial. He has suffered a 32 percent to 41 percent deficit in his muscle strength and a 20 percent permanent partial impairment to his lower extremity. One of Wahwasuck's co-workers testified that since the injury, Wahwasuck favors his good knee and moves slower in general. Because Wahwasuck's work involves hard, physical labor, it seems reasonably certain that his injury will affect his future employment possibilities.

Evidence was presented that prior to the accident, Wahwasuck was earning $7 an hour. The jury could take this into account in calculating future lost time or income for rehabilitation, surgery, and other medical needs.

Wahwasuck's injury is directly related to his arthritis. An arthritic condition usually progresses slowly, but it does not go away. If his knee swells or becomes painful, anti-inflammatory

medication is prescribed. The cost of such medication is approximately $1 a day. As discussed in Issue III, there also is a 50 percent chance that Wahwasuck's condition will require surgery. The surgery could cost from $2,500 to $10,000, and he could miss from one to ten days of work. If a joint replacement is necessary, a much longer period of unemployment would follow.

In addition to past and future lost income and medical costs, the jury also was instructed that if it found for Wahwasuck, it could award damages for past and future "[p]ain, suffering, disabilities, or disfigurement, and any accompanying mental anguish suffered." Because the verdict form was not itemized, it is not known how the jury allocated damages. The $200,000 award was not limited to economic or objective damages.

KP&L's analysis fails to take into account pain, suffering, and other subjective elements of damage. Subjective elements of damage are subject to a different standard of review than objective damage elements:

" 'Pain and suffering have no known dimensions, mathematical or financial. There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered. . . .'

"Such awards are overturned only if the collective conscience of the appellate court is shocked. [Citations omitted.]" *Morris*, 238 Kan. at 77-78.

Wahwasuck has suffered pain. The arthritis, which is related to his injury, makes his knee hurt constantly. Some days are worse than others.

Wahwasuck also has been forced to curtail his recreational activities, such as bowling, volleyball, and softball.

In view of the evidence, the collective conscience of this court is not shocked. Far larger damage awards have been upheld. See, *i.e.*, *Gaulden v. Burlington Northern R. R. Co.*, 236 Kan. 213, 213-14, 689 P.2d 852 (1984) ($434,000 judgment upheld; plaintiff suffered severe knee injury); *Merando v. A.T.& S.F. Rly. Co.*, 232 Kan. 404, 406-07, 656 P.2d 154 (1982) ($529,200 judgment upheld; plaintiff suffered functional impairment of both feet, future difficulty likely). The trial court did not abuse its discretion

in denying KP&L's motion for a new trial, which was based on excessive damages, or in not ordering a remittitur.

Affirmed.