No. 97,151

THE CITY OF MISSION HILLS, KANSAS, *Appellee*, v. RONALD E. SEXTON and FELICIA SEXTON, *Appellants*.

(160 P.3d 812)

Opinion filed June 22, 2007.

*Frederick K. Starrett*, of Lathrop & Gage L.C., of Overland Park, argued the cause and was on the briefs for appellants.

*Neil R. Shortlidge*, of Stinson Morrison Hecker LLP, of Overland Park, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: In this condemnation proceeding, the jury awarded landowners Ronald and Felicia Sexton $10,900 for the temporary partial taking of their property, via two easements, by the City of Mission Hills (City) for a sewer rehabilitation project. The Sextons contend that the trial court abused its discretion by denying their motion for a new trial. In raising this contention, they specifically argue that, in calculating the amount of compensation, the jury's verdict was contrary to the evidence presented at trial and contrary to Kansas condemnation law because it was based upon an expert opinion that used a flawed methodology not supported by Kansas law. The Sextons further assert that the trial court improperly admitted evidence regarding the City's actual use of the property easements and the limited scope of the taking. Finally, the Sextons contend they failed to receive a fair trial because the court erroneously admitted evidence and permitted arguments previously ruled inadmissible by the court in orders in limine.

We reject these contentions and affirm the jury verdict.

### Facts

The City began the rehabilitation of Mission Hills Sanitary Sewer District No. 1 to meet various state and Johnson County, Kansas,

standards so that the system could ultimately be transferred to the Johnson County wastewater system. The project encompassed the rehabilitation of 11,558 feet of sewer pipe and the repair or replacement of 136 manholes. Six hundred platted lots and 548 residences were within the sewer district being rehabilitated.

As part of the sewer project, the City condemned two temporary easements on the Sextons' property, an estate lot covering approximately 2.29 acres in Mission Hills, Kansas, so that the existing pipe and an existing manhole could be replaced. One easement was an access easement, consisting of a temporary road that enabled the City to move its equipment to the construction area. The second easement was a construction easement utilized to put in a new manhole and to rehabilitate the sewer line itself. The two easements covered approximately 5,242 square feet of the Sextons' property, and the duration of both easements was 1 year, running from August 4, 2005, until August 4, 2006.

The City placed mulch over the access easement and installed, per the Sextons' request, construction fencing around both easements. The amended condemnation petition required the City to replace any landscaping within the easements. The City was also required to repair or replace any "hardscape" or improvements such as sidewalks, walls, fences, lighting systems, and sprinkler systems.

George Eib, a consulting arborist and consulting landscape architect for the City, was called by the Sextons to testify. Eib recommended that the City require the contractor to lay 6 inches of mulch over the access easement area to prevent the compacting of tree roots. He testified that, because of the construction, a 7-inch diameter linden tree would be lost, as would five honeysuckle bushes measuring about 8-feet tall. Eib indicated that all landscaping features within the easements were being replaced.

### Expert Valuations

Two experts testified regarding the valuation of the Sextons' property.

Ken Wooten, a certified Kansas appraiser and president and owner of a real estate appraisal company in Prairie Village, Kansas,

testified on behalf of the Sextons. Wooten did not perform an actual appraisal of the property, but he testified that the fair market value of the Sextons' property before the temporary takings was $3,954,900, and the estimated total damages after the taking were $480,000.

Wooten evaluated the effect of the City's easements on the remainder of the Sextons' property and opined that heavy construction equipment would cause damage to trees outside of the easement areas. He also testified that the property's view was diminished by the construction equipment, workmen, orange fencing, and mulch. According to Wooten, the City's project negatively affected access to the property outside the easements for lawn maintenance. On another note, Wooten observed that the City's construction easement was located only 30 yards from the Sextons' master bedroom. This led him to conclude that the Sextons would have to invest in additional security measures, such as increased outside lighting, digital cameras, protective fences, and 24-hour security personnel during the active construction periods. Wooten also considered noise and pollution factors in his estimation of damages.

As for loss in marketability, Wooten estimated that it was reasonable to expect a 10, 12, or 15 percent adjustment in the sales price of the Sextons' property for a willing buyer in the marketplace on August 5, 2005.

Bernie Shaner, a professional appraiser in Overland Park, Kansas, testified on behalf of the City. He testified that he performed a "limited scope" appraisal on the land because, in his opinion, the house and the Sextons' property outside of the easement area were not impacted by the taking. Also, the parties agreed that Shaner would not appraise the Sextons' home and, instead, would use the value from certain county tax records.

To calculate the value of the Sextons' property immediately before the taking, Shaner first estimated the value of the land separate from the improvements. To do so, he used a comparable sales approach and performed a "bare ground" appraisal of vacant lots in Mission Hills, using six properties that had been purchased for the purpose of tearing down existing improvements and construct-

ing new improvements. Shaner explained that he selected six properties that were among the most comparable to the Sextons' property and were recent in time and fairly similar in location and size. Because the properties were not identical to the Sextons' property, he made adjustments to the sales prices for differences in location and size. With these adjusted sales, Shaner estimated that the land value of the Sextons' property as of the date of the taking was $22 per square foot or $2,195,500 for the lot. He then used the value of the Sextons' home from the county tax records, $1,759,430, and added that amount to his estimated land value. Shaner concluded that the total value of the Sextons' property immediately before the taking was rounded to $3,954,900.

On the question of the value of the property immediately after the taking, Shaner first assigned a fair rental value to the easements taken by the City. He estimated that each temporary easement was rented at a 10 percent annual rate of return, so $2.20 per foot was the fair rental value of the easements for 1 year. Then, Shaner multiplied the area of each temporary easement by $22 per square foot times an annual rate of return of 9.48 percent. (Shaner explained that 9.48 percent was the 10 percent rate based on one lump sum rental payment paid in advance.) Under this formula, the rental value of the access easement was $8,306, and the construction easement rental value was $2,625, with a rounded-down total equaling $10,900.

Shaner calculated the value of the Sextons' property immediately after the taking by subtracting the value of the land ($2,195,500) from the rental value of the temporary easements ($8,306 and $2,625) and then adding to that figure the value of the improvements ($1,759,430). This totaled $3,943,999, which Shaner rounded up to $3,944,000. In Shaner's opinion, the amount of just compensation for the takings was $10,900, which was the difference between his calculated value of the Sextons' property before and after the taking.

The jury ultimately returned a verdict of $10,900 as just compensation to the Sextons for the City's taking of the two easements on their property. The Sextons filed a motion for a new trial which was denied by the trial court.

## Analysis

The Sextons now make a timely appeal from the trial court's denial of their motion for a new trial. Specifically, they argue that their right to a fair trial was substantially affected because: (1) the jury's verdict was contrary to Kansas law and the evidence presented at trial; (2) the trial court admitted evidence showing that the two condemned easements were not used by the City for the entire 1-year term of the taking; and (3) the trial court admitted evidence and permitted arguments that violated the court's prior orders in limine and pretrial instructions to counsel. The Sextons raise several arguments relating to each issue.

ISSUE 1: *Was the verdict contrary to Kansas law and the evidence?*

The Sextons first contend that they are entitled to a new trial because the jury's verdict awarding them $10,900 as compensation for the City's taking of two temporary easements on their property was contrary to Kansas condemnation law and the evidence presented at trial. In presenting this argument they contend Shaner's opinion and, therefore, the jury verdict which relied upon the opinion were contrary to Kansas law because the opinion: (a) was based upon rental value methodology and failed to account for the factors included in K.S.A. 26-513(d); and (b) used comparable sales rather than comparable rentals as a basis for valuing the land even though the opinion was based upon rental value methodology.

### Standard of Review

Granting a motion for a new trial filed pursuant to K.S.A. 60-259(a) is within the trial court's discretion and will not be disturbed on appeal unless there is a showing of abuse of that discretion. *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 485, 15 P.3d 338 (2000); *Hurlbut v. Conoco, Inc.*, 253 Kan. 515, 527, 856 P.2d 1313 (1993).

As a general rule, a verdict will be set aside as contrary to law where, under the evidence, the verdict is contrary to the instructions given by the trial court. *City of Ottawa v. Heathman*, 236 Kan. 417, 421, 690 P.2d 1375 (1984) (citing 58 Am. Jur. 2d, New Trial § 134); see also *Timmerman v. Schroeder*, 203 Kan. 397, 400,

454 P.2d 522 (1969) (where jury verdict manifests disregard for court instructions on issue of damages, arbitrarily ignores proven elements of damages, and indicates passion, prejudice, or compromise on issues of liability and damages, that verdict should be set aside on motion for new trial). A new trial will not be granted, however, on mere allegations. There must be evidence that "the jury consciously conspired to undermine the jury process by ignoring the instructions. Otherwise, it must be presumed that the jury has properly determined the before and after values before arriving at damages." *City of Ottawa*, 236 Kan. at 426.

Further, when a party challenges a jury verdict as contrary to the evidence, the appellate court does not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the party who prevailed in the court below, supports the verdict, the appellate court should not intervene. *Wahwasuck v. Kansas Power & Light Co.*, 250 Kan. 606, 617, 828 P.2d 923 (1992).

### Kansas Law on Compensation for Partial Takings

Under K.S.A. 26-513(a), "[p]rivate property shall not be taken or damaged for public use without just compensation." In cases of a partial taking where "only a part of a tract of land or interest is taken," such as the City's taking of two temporary easements in this case, the statute provides that "the compensation and measure of damages is the difference between the fair market value of the entire property or interest immediately before the taking, and the value of that portion of the tract or interest remaining immediately after the taking." K.S.A. 26-513(c).

The major issue in a condemnation action is the condemned property's fair market value. *Board of Johnson County Comm'rs v. Smith*, 280 Kan. 588, 596, 123 P.3d 1271 (2005); *City of Wichita v. Eisenring*, 269 Kan. 767, 773, 7 P.3d 1248 (2000) (citing 5 Nichols on Eminent Domain § 18.05[1] [3d ed. 1997]). "Fair market value" is defined by statute under the commonly understood definition: "the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming

that the parties are acting without undue compulsion." K.S.A. 26-513(e). The next sentence of the statute states: "The fair market value shall be determined by use of the comparable sales, cost or capitalization of income appraisal methods or any combination of such methods." K.S.A. 26-513(e).

K.S.A. 26-513(d) provides a "nonexclusive list" of factors that "shall be considered" to determine the amount of compensation and damage where it is shown the factors apply. Some of the factors listed in the statute are: access, appearance, productivity and convenience, severance or division of the property, loss of trees or shrubs, cost of fencing, and proximity to improvements on land. The "factors are not to be considered as separate items of damages, but are to be considered only as they affect the total compensation and damage." K.S.A. 26-513(d). Because the list is nonexclusive, "any competent evidence bearing upon market value generally is admissible including those factors that a hypothetical buyer and seller would consider in setting a purchase price for the property." *Eisenring*, 269 Kan. at 773 (citing 5 Nichols on Eminent Domain § 18.05[1]).

### a. Rental Value Methodology and K.S.A. 26-513(d)

First, the Sextons contend that the jury's verdict was contrary to both the evidence and Kansas condemnation law because the jury, in awarding $10,900, obviously relied upon the opinion of Shaner, the City's expert. His opinion, according to the Sextons' argument, is contrary to Kansas law because it "does not include the appropriate factors to be considered under Kansas law in arriving at the fair market value" of the property immediately after the taking. More specifically, the Sextons claim that use of fair rental value fails to take into consideration the K.S.A. 26-513(d) statutory factors. Because Shaner's opinion is contrary to law, the Sextons further argue, the verdict which was based on that opinion is also contrary to the law.

The City responds that the Sextons' argument is a disguised objection to the admissibility of the evidence, an objection which the Sextons waived by not making it contemporaneously. Acknowledging that the issue formulated by the Sextons focuses upon the de-

nial of the motion for a new trial, the City makes an additional argument, citing support for the conclusion that Shaner's methodology comports with standard appraisal practice.

While Kansas eminent domain statutes do not specifically mention the fair rental value methodology as an appropriate means of calculating the value of temporary takings or, for that matter, any taking, income capitalization is specified as one of the methods for calculating fair market value. K.S.A. 26-513(e) (fair market value is to be determined by the "use of the comparable sales, cost or capitalization of income appraisal methods or any combination of such methods"). The capitalization of income method "utilizes a formula to capitalize the fair rental value of the property being appraised." *Mooney v. City of Overland Park*, 283 Kan. 617, 622, 153 P.3d 1252 (2007). Thus, the income capitalization method utilized by Shaner is statutorily recognized and has been utilized in many Kansas cases.

Despite the statutory recognition of the method, the Sextons have some basis for their complaint regarding the use of the rental value method for valuing the subject property. Phillip Nichols, a prominent commentator on eminent domain law, notes that generally "[i]mplicit in the use of the capitalization method is the futurity of the rental." 4 Nichols on Eminent Domain § 12B.08[3], p. 12B-54.1 (3d ed. 2006). In this case, there is no evidence of the actual rental income, either past or future.

Despite this anomaly, the City is correct that rental value is an accepted method of valuing the fair market value of temporary easements. In fact, Nichols categorizes the rental value approach as the "most widely accepted measure of compensation for the taking of a temporary easement." 9 Nichols on Eminent Domain § 32.08[2][a], p. 32-38. Nichols recognizes that partial takings and temporary easements are often difficult to value; generally the "before and after" rule (like the one in K.S.A. 26-513) measures permanent reductions in fair market value. Hence, appraisers sometimes utilize a rental approach as if the easement area were being rented for the duration of the temporary easement. See 9 Nichols on Eminent Domain § 32.08. Nichols explains: "The advantage [the rental value] method offers is simplicity, particularly if a rental

value per square foot can be established." 9 Nichols on Eminent Domain § 32.08[2], p. 32-38. The rental value approach "provides the owner of the property affected by the easement with compensation for the restriction on the owner's fee interest and any resulting interference with the owner's use." 9 Nichols on Eminent Domain § 32.08[2], pp. 32-38 to 32-39.

Other states have also used the fair rental value methodology in the context of temporary easements. See, *e.g.*, *City of Fort Smith v. Findlay*, 48 Ark. App. 197, 893 S.W.2d 358 (1995) (temporary easement is valued as the fair rental value of the property for the time it is used); *Fowler v. City of Boulder*, 17 P.3d 797, 801-02 (Colo. 2001) (finding that owner of parcel that was temporarily taken during construction of drainage project was entitled to parcel's fair rental value, as well as restoration costs); *State ex rel. Missouri Highway & Transp. Comm'n v. Beseda*, 892 S.W.2d 740, 741 (Mo. App. 1994) (damages for a temporary partial taking are reasonable rental value of the land temporarily acquired and damages which the jury might find will result to the remaining land because of such temporary use).

In this case, in stating an opinion regarding the damages caused by the temporary easement, Shaner utilized a methodology recognized under K.S.A. 26-513(e), and his testimony complied with the Kansas definition of fair market value when he testified to the difference in the fair market value of the Sextons' property before the taking and the fair market value after the taking and opined that the difference was best measured by the rental value during the use of the easement.

The Sextons complain that the fair rental value methodology does not take into consideration the statutory factors of K.S.A. 26-513(d). The provision states: "[T]he following nonexclusive list of factors *shall* be considered if such factors are shown to exist." K.S.A. 26-513(d). We agree that the provision requires the jury to consider the factors. Instruction number 13 included several of the factors listed in K.S.A. 26-513(d), and the Sextons did not object to the instruction.

Moreover, Shaner opined that the rental value methodology took into account the K.S.A. 26-513(d) statutory factors for determining

compensation and damages. He explained that in a situation involving a temporary construction easement, the City's rights are more limited than in a situation involving, for instance, a typical residential rental. Shaner indicated that he considered: (1) which factors were relevant to the City's use of the property and (2) how a buyer would perceive this use. Acknowledging that there are circumstances where a rental value alone would not adequately reflect the fair market value of an easement taking, Shaner gave an example of a temporary easement associated with a road widening project that would require removing a large tree from the easement area. To the extent the tree adds value to the property and is not going to be replaced by the condemning authority at its own cost, Shaner opined that an addition would have to be made to the rental value to compensate the landowner for the loss of the tree.

By contrast, Shaner indicated that, in his opinion, no additions to rental value were necessary in this case. According to Shaner's reasoning, such additions were unnecessary because the condemnation petition required the City to restore or replace all grass, plants, shrubs, and trees to match existing "plantings" and landscaping as close as possible with like-kind landscaping and to repair, replace, or restore all existing hardscape and improvements, including sidewalks, wall, fences, lighting systems, and sprinkler systems, to conditions not less than those existing before the commencement of construction. See Hopkins, *Just Compensation: Elementary Principles and Considerations to Ensure the Property Owner is Made Whole*, Fundamentals of Condemnation Law and Land Valuation, ALI-ABA 53, 113 (January 2006) (stating the cost to cure damages inflicted to the property is a mitigation of damages doctrine); see also *City of Riverside v. Kraft*, 203 Cal. App. 2d 300, 303, 21 Cal. Rptr. 425 (1962) ("[O]n the 'cost to cure' theory of severance damage value . . . , that as to the property not taken, the cost of necessarily relocating improvements on the land not taken so as to place the owner as nearly as possible in the position he was before the front of his property was taken, might be considered on the question of the difference in fair market value before and after the taking.").

Consequently, Shaner's opinion did comply with the mandate of K.S.A. 26-513(d); he considered the impact of various factors on the fair market value of the property before and after the taking. It follows that the jury verdict, which was consistent with Shaner's opinion, was not contrary to Kansas law. Thus, in testifying regarding the damages caused by the taking of the temporary easements, Shaner utilized a methodology recognized by statute, and his testimony complied with the Kansas definition of fair market value when he opined that the difference in the fair market value of the condemned property before the taking and the fair market value after the taking is best measured by the rental value during the use of the temporary easement and that such a method takes into account the statutory factors of K.S.A. 26-513(d).

We further note that to the extent the Sextons questioned Shaner's opinion in the context of whether the legally acceptable methodology most appropriately measured fair market value under the facts of the case, any deficiencies in Shaner's analysis were explored through cross-examination. See *Willsey v. Kansas City Power & Light Co.*, 6 Kan. App. 2d 599, 603, 631 P.2d 268 (1981) (once witness has qualified as expert, court cannot regulate the factors used by the witness or his or her mental processes to arrive at his or her conclusion; matters can only be challenged by cross-examination). In this case, although Shaner's valuation testimony was presented in its entirety on direct examination without objection from the Sextons' attorney, Shaner did undergo vigorous cross-examination regarding his valuation methodology. Ultimately, the weight of the two experts' opinions was left in the hands of the jury. Without question, a factfinder can find one expert opinion more credible than another. It is not this court's duty to pass on the credibility of witnesses, including expert witnesses. See *Wahwasuck*, 250 Kan. at 617.

Consequently, we conclude there was no error in the use of the rental value methodology and the trial court was correct that there was no basis for granting a new trial because of Shaner's expert testimony or because the jury accepted that testimony as the basis for its verdict.

### b. Comparable Sales v. Comparable Rentals

The Sextons also take issue with Shaner's usage of the comparable sales method to estimate the land value. They complain that Shaner "estimated only the rental value of the [Sextons'] vacant land, not the sale value of land with a residence" and that Shaner "did not perform a comparable rental analysis to look for other rental properties in Mission Hills." Their arguments are not persuasive for several reasons.

First, the comparable sales method of valuation (market data approach) is a well-recognized method of valuation in Kansas. *Eisenring,* 269 Kan. at 774. Second, based on the parties' agreement, Shaner accepted the county appraiser's estimate of the contributing value of the improvements on the Sextons' property to be $1,759,430. Thus, Shaner obtained what he believed were six comparable sales of "tear down" properties in prestigious Mission Hills and, after making the requisite adjustments to the sales of the comparable properties, established a land value of $22 per square foot or $2,195,500 for the Sextons' lot.

Third, the Sextons cite no authority to support the contention that Shaner was obligated to perform a comparable rental analysis in estimating values. Shaner went into meticulous detail, however, concerning the comparable sales he utilized in the calculation of the Sextons' land value. And he ultimately based the compensation and damages resulting from the partial taking on the difference between the fair market value of the entire property before the taking and the value after the taking. Finally, K.S.A. 26-513(e) allows the use of comparable sales, cost, capitalization of income, or "any combination" of those methods.

We further note that the trial court instructed the jury in conformity with the Kansas condemnation statutory provisions and PIK Civ. 3d 131.04 (Measure of Compensation—Partial Taking). In addition, the jury was instructed on the correct definition of "fair market value."

We conclude that the jury's verdict conforms to Kansas condemnation law. Again, while there may be a basis to argue the methodology was flawed under the facts of this case or that Shaner

mixed methodologies by using comparable sales when calculating rental value, those are arguments which go to the weight the jury should give the opinion and are matters subject to cross-examination. The evidence was admissible and the evidence, when considered in the light most favorable to the City (the party whose position was accepted by the jury), supports the jury's verdict. Therefore, the trial court did not err by denying the Sextons' motion for a new trial on this ground.

ISSUE 2: *Did the trial court abuse its discretion by improperly admitting evidence regarding the City's actual use of the easements and the limited scope of the taking?*

Next, the Sextons argue that the trial court should have granted their motion for a new trial because the court improperly admitted evidence regarding the City's actual use of the two temporary easements on their property and the limited scope of the taking. More specifically, the Sextons make two arguments: (a) The trial court should not have allowed testimony that, despite the City's 1-year taking of the two temporary easements, the City did not use the easements for the entire 1-year term of the taking; and (b) the trial court erred in allowing the City, over the Sexton's objections, to introduce into evidence portions of the amended condemnation petition that allowed the jury to infer the Sextons could use the area subject to the easements during the 1-year period.

## Standard of Review

As previously discussed, the trial court's decision whether to grant a motion for a new trial is subject to an abuse of discretion standard of review. *Dougan*, 270 Kan. at 485; *Hurlbut*, 253 Kan. at 527.

In this second issue, the Sextons present several arguments regarding why a new trial is warranted, and each of those arguments relates to the admission of evidence. Generally, relevance is the first consideration when the trial court decides whether to admit evidence and also when the appellate court reviews the trial court's decision. Unless prohibited by statute, constitutional provision, or court decision, all relevant evidence is admissible. K.S.A. 60-407(f); *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 (2006). Evidence

is relevant if it has any tendency in reason to prove any material fact. K.S.A. 60-401(b). To establish relevance, there must be some material or logical connection between the asserted facts and the inference or result they are intended to establish. *Gunby*, 282 Kan. at 47. An appellate court reviews the determination of relevancy under an abuse of discretion standard. The party challenging the ruling bears the burden of showing an abuse of discretion. *State v. Morton*, 283 Kan. 464, 473, 153 P.3d 532 (2007).

Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the trial judge's discretion, depending on the contours of the rule in question. *Gunby*, 282 Kan. at 47-48. "When the adequacy of the *legal* basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo." 282 Kan. at 48. The issue raised here is the legal basis for the admission of the evidence, and the question is subject to our de novo review.

### a. Admission of the City's Limited Use of the Easements

The City, over the Sextons' objection, presented the testimony of City Administrator Courtney Christensen that, despite language in the amended petition indicating that the City would have access to the easements for 1 year, the construction phase lasted 2 weeks—January 3, 2005, to January, 17, 2005. Christensen explained that she decided to make the duration 1 year because at the time of the taking, the project had not yet been bid. This time period took into consideration the fact that the contract schedule was unknown, and the City was obligated to restore the site to its prior condition following construction. After the construction was complete, the restoration and cleanup was conducted until January 27, 2005. The trial court permitted the testimony because the court thought it put into context "some of the evidence that's been introduced from the landowner."

Allowing the admission of this evidence was contrary to Kansas law which provides that landowners are entitled to full compensation for the actual rights acquired by the condemnor, not the rights actually used. *In re Application of City of Great Bend for*

*Appointment of Appraisers*, 254 Kan. 699, 701, 869 P.2d 587 (1994); *Hoy v. Kansas Turnpike Authority*, 184 Kan. 70, 334 P.2d 315 (1959). The law requires the condemnor in the verified petition to describe the nature of the interest to be taken and further requires the appraisers, after receiving written instructions from the court, to view and value the land taken and to assess damages resulting from the taking. Upon completion of their work, the appraisers must file their report in the district court clerk's office. K.S.A. 26-505; K.S.A. 2006 Supp. 26-506. The appraisers' report identifies the interest taken and the damages resulting from the taking. It is from this report that an appeal is taken by a dissatisfied party. *Application of City of Great Bend*, 254 Kan. at 702.

The description of the nature of the condemnor's interest is of utmost importance. In *Hudson v. City of Shawnee*, 246 Kan. 395, Syl. ¶ 2, 790 P.2d 933 (1990), this court said that "[t]he property rights taken by a condemnor are to be determined by the language in the petition for eminent domain and the appraisers' report. A condemnor bears the burden of drafting its petition to show the limitations in its taking."

This same principle was affirmed in *Application of City of Great Bend*, 254 Kan. 699, where experts for the condemnor attempted to introduce evidence showing a lesser taking than was described in the petition for condemnation and the appraisers' report. While this court found no prejudice to the rights of the landowners in the admission of the evidence, we reviewed Kansas law and concluded:

"[O]nce the nature of the interest to be taken is identified in the [petition and] appraisers' report, parol evidence will not be admitted for the purpose of establishing a lesser interest based on the condemnor's intended use. The rights acquired, not the intended use of those rights, are the basis for assessing landowners' damages. [Citation omitted.]" 254 Kan. at 703.

The rationale for such a principle is apparent because " '[i]f the landowners are not compensated in full for the full use, as set out in the [appraisers'] report, the condemnor can take the full use in the future without further compensation to the landowners.' [Citation omitted.]." 254 Kan. at 703; see *Hudson*, 246 Kan. 395, Syl. ¶ 2; *Spears v. Kansas City Power & Light Co.*, 203 Kan. 520, Syl.

¶ 4, 455 P.2d 496 (1969); *Diefenbach v. State Highway Commission*, 195 Kan. 445, Syl. ¶ 4, 407 P.2d 228 (1965).

The Sextons cite *Hudson,* 246 Kan. 395, to support their contention that they are entitled to a new trial because of evidence relating to the City's use of the temporary easements for a shorter period than the 1 year described in the eminent domain petition.

In *Hudson,* the City of Shawnee's petition for condemnation described the easement in broad terms, incorporating the use of all three driveways to the property. Even though there was evidence that at least one of the driveways was always open to the landowner and the landowner's customers, the City was prohibited from introducing evidence that the condemnor's intended use was less than the fullest use permitted under the description of its easement. The language used by the City in its petition controlled. 246 Kan. at 400-01.

The City does not disagree with the Sextons' assertion that they are entitled to compensation for 1 year's use of the easements. The City merely contends that "[a]t no time did the City ever suggest that it would have the use of the easements for less than a full year." The appellee points out that the City's expert, Bernie Shaner, testified on direct examination that his appraisal testimony was predicated upon 1 year's use of the easements. Additionally, this point was emphasized by the Sextons' counsel during the cross-examination of Shaner:

"Q. Now, the City had full access and use of the property for that year. Correct? Have. They have. They're still using it.
"A. For the purposes outlined in the petition only.
"Q. Well if they need to go back in and redo anything, they can do it. Correct?
"A. Sure. But they . . . can't use it for other purposes . . . .
"Q. Sure. But as long as they're involved in working on their sewer there, they've got it for a year. Right?
"A. That's right. Yes."

Although dealing with a permanent easement, not a temporary easement, *Roberts v. Upper Verdigris Watershed,* 193 Kan. 151, 392 P.2d 914 (1964), is instructive here. In *Roberts,* an easement was taken for the impounding, permanent storage, and temporary detention of certain waters. Occasionally, the entire area within the

easement was covered with flood waters, but when it was not covered with such waters, the landowner was permitted to use the portion of the land within the easement which was not inundated with water. The landowner contended and presented his evidence to the jury on the ground that the condemning authority would make full use of a permanent easement and damages to the remaining acreage. The condemning authority argued it was taking only a restricted use of the condemned land, seeking to avoid the payment of compensation and damages based on the full use of the easement.

The trial court instructed the jury to "give consideration to all the evidence pertaining to damages in arriving at an amount which you think plaintiffs are entitled" and noted within the instruction that the defendant's witnesses testified that in their opinions the plaintiffs were not entitled to damages equaling the full extent of the market value of the property. 193 Kan. at 155. In addition, the court refused to give the plaintiffs' requested instruction that they were entitled to damages to the extent of the full market value of the property.

The *Roberts* court stated that the commissioners' appraisal report, and only their report, was evidence of the land appropriated, the extent of the easement, and its use. 193 Kan. at 157. The court went on to say:

"The injustice that would result to the landowners is readily apparent, if a condemnor could introduce evidence as to a limited use for the purpose of reducing the amount of damages to the landowners, and later exercise the full use by virtue of the commissioners' report.

. . . .

"The extent of the easement and the extent of the use, that is the rights required, are not questions of fact. They are questions of law to be determined from the language used in the commissioners' report." 193 Kan. at 158.

The *Roberts* court concluded that the trial court erroneously admitted evidence regarding the condemnor's future intended use of the easement which varied the extent of the use set out in the commissioners' report. It further stated that the trial court erred by allowing the jury to determine the extent of the use. Instead, the plaintiffs' requested instruction, which was not given, properly

stated the law. Although the *Roberts* court found other errors as well, it indicated that the erroneous admission of evidence was sufficient to require the granting of a new trial. 193 Kan. at 160.

In the present case, the evidence pertaining to the City's limited use of the two temporary easements was clearly inadmissible. We, therefore, must consider whether the Sextons were entitled to a new trial.

Under K.S.A. 60-261, a new trial cannot be granted based upon an error in either the admission or the exclusion of evidence unless refusal to grant the new trial is "inconsistent with substantial justice." If the error does not prejudice the substantial rights of a party, the error is harmless, must be disregarded, and does not afford a basis for reversal of a judgment. *Smith v. Printup,* 262 Kan. 587, 603, 938 P.2d 1261 (1997).

In this case, there is no showing that the Sextons' substantial rights were prejudiced. In contrast to *Roberts,* the City did not make arguments in an attempt to reduce the award of damages, and the jury was properly instructed on the law, *i.e.,* that the Sextons were entitled to damages for the City's use of the easements for 1 year. Moreover, the City's own expert based his valuation report on the fact that the temporary easements were taken for a period of 1 year. The jury accepted this valuation and did not further discount it for damages covering a shorter period of time. Under the circumstances of this case, the admission of the evidence was harmless. Consequently, the trial court did not abuse its discretion in denying the motion for new trial.

### b. Admission of the Amended Condemnation Petition

The Sextons also contend that the trial court erred by allowing the City, over the Sextons' objections, to introduce into evidence portions of the amended condemnation petition. They argue that, in so doing, the court unfairly permitted the jury to infer that it could consider limitations on the taking. The Sextons specifically take issue with the portion of the amended petition which permitted their use and substantial access to the easements during the City's period of taking.

The Sextons contend that the paragraphs of the petition pertaining to the landowners' use and access to the easements actually described a "conditional taking," evidence which should not have been presented to the jury. The City argues that the Sextons' characterization of the taking as "conditional" is merely a "red herring."

We are limited in our ability to adequately review this issue. The Sextons did not include a copy of the amended condemnation petition in the record on appeal. Instead, they merely attached a copy of the petition to the appendix of their appellate brief. This is insufficient. An appellant has the burden to designate a record sufficient to establish the claimed error; without such a record, the claim of error fails. *State ex rel. Stovall v. Alivio*, 275 Kan. 169, 172, 61 P.3d 687 (2003). An appellate brief may include an appendix, but that appendix is to consist of extracts from the record on appeal; an appendix cannot be used as a substitute for the record on appeal. Kansas Supreme Court Rule 6.02(f) (2006 Kan. Ct. R. Annot. 36); see also *In re Marriage of Brotherton*, 30 Kan. App. 2d 1298, 1300, 59 P.3d 1025 (2002) (materials not in the record on appeal will not be considered by appellate court).

Moreover, the Sextons' argument is without merit. The Sextons fail to provide any authority for their contention that the City's taking was "conditional." Rather, the petition described the taking, and that taking allowed the use of the property. See *Hudson*, 246 Kan. 395, 400-01 (property rights taken by the condemnor are determined by the language in the condemnation petition and appraisers' report; condemnor bears the burden of drafting the petition to show the limitations in its taking). We further note that K.S.A. 26-513(d), which lists nonexclusive factors to consider in ascertaining the amount of compensation and damages, names "convenience" as a factor. K.S.A. 26-513(d)(4); see also *Montana Dept. of Transp. v. Simonson*, 320 Mont. 249, 256, 87 P.3d 416, 420, (2004) ("Compensating a party for loss of access is appropriate only when access has been completely denied or the access provided is unreasonable."). The landowners' opportunity to use or access the property subject to the temporary easements can be considered a convenience.

We cannot conclude the trial court abused its discretion by allowing testimony pertaining to portions of the amended petition.

ISSUE 3: *Did the trial court erroneously admit evidence and permit arguments regarding matters previously ruled inadmissible in the court's in limine orders and pretrial instructions to counsel, depriving the Sextons of a fair trial?*

Finally, the Sextons argue the trial court should have granted their motion for a new trial because the court erroneously admitted evidence and permitted argument regarding matters previously ruled inadmissible in the court's in limine orders and pretrial instructions to counsel, depriving the Sextons of a fair trial. More specifically, the Sextons argue the trial court erred in allowing (a) testimony regarding an itemization of damages assessed to various K.S.A. 26-513(d) factors, (b) testimony regarding the scope of the project and the impact on other landowners; and (c) a speaking objection.

### Standard of Review

Our standard of review on this final issue ultimately rests on whether a new trial should be granted. As we have previously discussed, an abuse of discretion standard applies to this determination. *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 485, 15 P.3d 338 (2000); *Hurlbut v. Conoco, Inc.*, 253 Kan. 515, 527, 856 P.2d 1313 (1993).

The specific basis for the plea for new trial relates to alleged violations of orders in limine entered after consideration of the Sextons' five in limine motions. Courts employ " 'a two-part test to evaluate alleged violations of an order in limine: (1) Was there a violation of the order in limine and (2) if the order in limine is violated, did the testimony substantially prejudice the defendant? The burden is on the [party alleging a violation of the order in limine] to show substantial prejudice.' [Citations omitted.]" *State v. Gleason*, 277 Kan. 624, 640, 88 P.3d 218 (2004).

Our efforts to determine the first prong of this test are hampered by the lack of an adequate appellate record. The Sextons contend that before trial, the court entered orders in limine prohibiting the parties from presenting evidence of expert Ken Wooten's itemi-

zation of damages and evidence regarding other landowners affected by the City's sewer project. They further contend that the court gave counsel pretrial instructions to refrain from voicing "speaking objections" during trial. The Sextons take issue with the City's "speaking objection" regarding Mr. Sexton's testimony on the fair market value of his property.

The City contends that the Sextons' motion in limine concerning Wooten's testimony was denied. But, as the City points out in its appellate brief, the Sextons failed to include in the record on appeal a transcript of the motions in limine hearing. And the trial court apparently did not issue written orders after the hearing.

Again, the appellant has the burden to designate a record sufficient to establish the claimed error; without such a record, the claim of error fails. *Alivio*, 275 Kan. at 172. The Sextons acknowledge that there is no transcript of the motions hearing in the appellate record, but they contend that this court has an adequate basis to review the merits of this evidentiary issue because they properly preserved their objections to the testimony in question and provided a copy of the trial transcript in the appellate record.

Unfortunately, the trial transcript alone does not provide this court with the trial court's rulings on the motions in limine or the trial court's complete reasoning with respect to those rulings. However, the record before us allows some limited analysis of the Sextons' arguments, not as to whether there were violations of orders in limine but as to the specific issue of prejudice.

### a. Testimony Regarding Itemized Damages

Regarding Wooten's testimony, the Sextons note that K.S.A. 26-513(d) provides that the nonexclusive factors listed in the statute "are not to be considered as separate items of damages, but are to be considered only as they affect the total compensation and damage." During trial, the City's attorney asked Wooten on cross-examination whether he assigned $100,000 in damages for lack of access. Before Wooten responded to the question, the Sextons' attorney objected and moved for a mistrial, arguing that this violated court orders.

The trial court denied the motion for a mistrial and permitted the City to ask Wooten only if he had assigned a dollar amount for the lack of access factor, not the specific dollar amount itself. The court found that the actual dollar amount would be irrelevant, confusing to the jury, and contrary to the law. In addition, the trial court indicated that the jury would be instructed that itemization was not the way to calculate an eminent domain award. When Wooten was then asked if he assigned a dollar amount to that factor, he answered in the affirmative.

The City also points out that Wooten first mentioned the $100,000 figure during direct examination when testifying about his estimate of damages. Before he could explain himself fully, however, the Sextons' attorney stopped him. In looking at the trial transcript, it appears that the court permitted counsel to question Wooten regarding his method of valuation, which involved Wooten's assigning values to various damage factors. The specific values assigned to each factor, however, were not allowed into evidence. The City's purpose for this line of questioning was to discredit Wooten's method of valuation.

The brief mention of $100,000 in partial damages does not appear to have caused prejudice to the Sextons. Besides, the jury was instructed that the statutory factors "are not to be considered by you as separate items of damage, but are to be considered only as they affect the fair market value of the property." We presume that the jury followed the trial court's jury instructions. *McConwell v. FMG of Kansas City, Inc.*, 18 Kan. App. 2d 839, 852, 861 P.2d 830, *rev. denied* 254 Kan. 1007 (1994). The Sextons have not shown they are entitled to relief.

### b. Testimony Regarding Other Landowners

In one motion in limine, the Sextons asked the trial court to preclude evidence concerning other landowners receiving compensation for takings under the City's sewer project. The parties agree that numerous other landowners in Mission Hills were affected by the City's sewer project. After the jury was empaneled but before trial began, the Sextons' attorney made an argument about anticipated evidence concerning the scope and extent of the

sewer project and that it would not be a proper consideration for the jury.

The trial court acknowledged that it had already ruled it would be improper to suggest that nobody else had asked for compensation. The court stated: "The physical scope of the project, I'll permit. Not the financial scope of the project." The court explained that the whole scope of the project could be relevant to explain the City's easements on the Sextons' property. The City then presented evidence, over the Sextons' objections, regarding the physical scope of the sewer project. The evidence included the age of the old system, the boundaries of the project, the number of residences involved, and an overview of the project.

The Sextons argue that evidence concerning the number of landowners impacted by the sewer project implied to the jury that the City already had to pay a large number of residents for easements. Other landowners' compensation, however, was never admitted into evidence; neither do the Sextons cite any authority showing that the testimony regarding the scope of the project was inadmissible.

Additionally, the Sextons fail to establish a basis for finding prejudice because of the admission of the evidence. The jury was instructed that "[e]nhancement or depression of value due to anticipated improvements by a project for which condemnation is sought, in this case improvement of the sanitary sewer system, are excluded from consideration in determining the fair market value of the property taken." Again, we presume that the jury followed the trial court's jury instructions. *McConwell*, 18 Kan. App. 2d at 852.

### The City Attorney's "Speaking Objection"

Finally, the Sextons take issue with the City attorney's "speaking objection" during the City's cross-examination of Mr. Sexton. In the presence of the jury, the City attorney moved to strike Mr. Sexton's testimony: "Your Honor, I'm going to move to strike the witness' testimony as being an improper valuation in violation of the statute. He's clearly been—based upon his deposition testi-

mony, had values assigned to each one of these categories and added them up."

Outside the presence of the jury, the Sextons' attorney then moved for a mistrial, arguing that the "objection . . . made in front of the jury . . . was highly prejudicial" and that before trial the court had cautioned counsel not to make any "speaking objections." The judge denied the motion for a mistrial. Although the judge thought the City's attorney gave more information than needed, the judge noted that this may have been because there was a "long gap" as the judge paused to think through the evidence being presented by the witness and consider the objection. The judge noted that the City's attorney "may have taken [the gap] for a requirement for a little more articulation." Additionally, the judge concluded that there was no prejudicial error.

We agree with this conclusion. The jury was properly instructed regarding fair market value and the calculation of damages. The Sextons fail to show how the City attorney's objection was prejudicial.

We conclude the trial court did not abuse its discretion by denying the Sextons' motion for a new trial.

Affirmed.